Christopher Erwin #123078
Name

PO Box 2 301 East Kansas (Highway 7)

Lansing, KS 66043
Address

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

Christopher Erwin #123078 , Plantiff
*(Full Name)*

v.

Jeff Zmuda, et al , Defendant (s)

CASE NO. 22-3170-JWL-JPO
(To be supplied by the Clerk)

CIVIL RIGHTS COMPLAINT
PURSUANT TO 42 U.S.C.
§1983

### A. JURISDICTION

1) Christopher Erwin #123078 , is a citizen of Kansas
*(Plaintiff)* *(State)*

who presently resides at Lansing Correctional Facility PO Box 2 301 East
*(Mailing address or place*
Kansas (Highway 7) Lansing, KS 66043
*of confinement.)*

2) Defendant Jeff Zmuda is a citizen of
*(Name of first defendant)*

Topeka, KS , and is employed as
*(City, State)*

Secretary of Corrections KS Dept. of Corrections . At the time the
*(Position and title, if any)*

claim(s) alleged in this complaint arose, was this defendant acting under the color of state

law? Yes ☒ , No ☐ . If answer is "Yes", briefly explain:

Jeff Zmuda Is the Secretary of Corrections and acted

in his official and individual capacity.

XE-2 8/82          CIVIL RIGHTS COMPLAINT §1983

1

3) Defendant __Libby Keogh__ is a citizen of
   *(Name of second defendant)*

   __Topeka, KS__ , and is employed as
   *(City, state)*

   __CM for KDOC (SOC Designee)__ . At the time the
   *(Position and title, if any)*

   claim (s) alleged in this complaint arose was this defendant acting under the color of state

   law? Yes ☒ No ☐ . If your answer is "Yes", briefly explain:

   __They are a KDOC Corrections Manager (CM) and act as__
   __the Secretary of Correction's Designee for grievances. in__
   __their official and individual capacity.__
   (Use the back of this page to furnish the above information for additional defendants.)

4) Jurisdiction is invoked pursuant to 28 U.S.C. §1343(3); 42 U.S.C. §1983. (If you wish to

   assert jurisdiction under different or additional statutes, you may list them below.)

   _____

   _____

## B. NATURE OF THE CASE

1) Briefly state the background of your case:

   __My 8th amendment rights have been violated. I was,__
   __and am currently on an ongoing basis being denied__
   __adequate medical care, medically sufficient and__
   __necessary medical diet for my Type 1 Diabetes,__
   __and access to medical care to treat my type 1__
   __diabetes including, but not limited to, access to__
   __carbohydrate information to match carbs to insulin, proper snack sacks__
   __reasonable and necessary timing of meals/insulin, medical device.__

Defendants continued....

4) Defendant Darcie Holthaus is a citizen of Topeka, Kansas and is employed as Secretary of Corrections Designee /Corrections Manager II. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ NO ☐. If your answer is "Yes", briefly explain:
Darcie Holthaus was the Secretary of Corrections Designee /Corrections Manager II at all relevant times mentioned in this complaint. She acted under color of state law in both her official and individual capacity.

5) Defendant Jeff Butler is a citizen of El Dorado, Kansas and is employed as Warden of El Dorado Correctional Facility. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:
Jeff Butler was the Warden of El Dorado Correctional Facility at all relevant times mentioned in this complaint. He acted under color of state law in both his official and individual capacity

6) Defendant (fnu)(lnu) Aramark Correctional Services Dietician is a citizen of Kansas and provided services @ EDCF and LCF. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law?

Yes ☒ No ☐. If your answer is "Yes", briefly explain: ACS Dietitian provided services at EDCF and LCF at all relevant times mentioned in this complaint. He acted under color of state law both in their official and individual capacity.

7) Defendant (fnu) Moore is a citizen of El Dorado, Kansas and is employed as Deputy Warden and the Warden's Designee. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain: Deputy Warden Moore was the Deputy Warden and the Warden's Designee at all relevant times mentioned in this complaint. He acted under color of state law in both his official and individual capacity.

8) Defendant M. Bos is a citizen of El Dorado, Kansas and is employed as Classification Administrator and Warden's Designee. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain: M. Bos was the Classification Administrator and Warden's Designee at all relevant times mentioned in this complaint. She acted under color of state law in both her official and individual capacity.

9) Defendant Dale Call is a citizen of El Dorado, Kansas and is employed as Captain. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐.
If your answer is "Yes", briefly explain:
Dale Call was the Captain at all relevant times mentioned in this complaint. He acted under color of state law in both his official and individual capacity.

10) Defendant A.J. Johnson is a citizen of El Dorado, Kansas and is employed as Lieutenant. At the time the claim(s) alleged in this complaint arose was this Defendant acting under color of state law?
Yes ☒ No ☐. If your answer is "Yes", briefly explain:
A.J. Johnson was the Lieutenant at all relevant times mentioned in this complaint. He acted under color of state law in both his official and individual capacity.

11) Defendant (fnu) Martin is a citizen of El Dorado, Kansas and is employed as Unit Team Manager. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:
Ms. Martin was the Unit Team Manager at all relevant times mentioned in this complaint. She acted under color of state law in both her official and individual capacity.

12) Defendant (fnu) Buchanan is a citizen of El Dorado, Kansas and is employed as Unit Team Supervisor. At the time the Claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain: Mz Buchanan was a Unit Team Supervisor at all relevant times mentioned in this complaint. She was acting under color of state law in both her official and individual capacity.

13) Defendant (fnu) Horsch is a citizen of El Dorado, Kansas and is employed as Unit Team Supervisor. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain: Mr. Horsch was a Unit Team Supervisor at all relevant times mentioned in this complaint. He acted under color of state law in both his official and individual capacity.

14) Defendant (fnu) Daignault is a citizen of El Dorado, Kansas and is employed as a Unit Team Supervisor. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes" briefly explain: Mr. Daignault was a Unit Team Supervisor at all

relevant times mentioned in this complaint. He acted under color of state law in both his official and individual capacity.

15) Defendant (fnu) Kasper is a citizen of Topeka, Kansas and is employed as a CS1 and Officer In Charge for D Cell House. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain: Mr. Kasper was a CS1/OIC - D cell House at all relevant times mentioned in this complaint. He was acting under color of state law in both his official and individual capacity.

16) Defendant (fnu) Galli is a citizen of EL Dorado, Kansas and is employed as a CS1 and Hearing Officer. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain: Ms Galli is a CS1 and Hearing Officer at all relevant times mentioned in this complaint. She acted under color of state law in both her official and individual capacity.

17) Defendant (fnu) Webster is a citizen of EL Dorado, Kansas and is employed as a CS1 and Hearing Officer. At the time the claim(s) alleged

in this complaint, the actual under color of state

A-cellhouse at all relevant times mentioned.

Mr. Funk was a CS1 and Officer in charge for

If your answer is "Yes," briefly explain:

acting under color of state law? Yes ☒ No ☐

alleged in this complaint arose was this defendant

Charged at A-cellhouse. At the time the claim(s)

Kansas and is employed as a CS1 and Officer in

19) Defendant (name) Funk is a citizen of El Dorado,

both his official and individual capacity.

complaint, the acted under color of state law in

A-cellhouse at all relevant times mentioned in this

Mr. Austin was a CS1 and Officer in Charge for

If your answer is "Yes," briefly explain:

acting under color of state law? Yes ☒ No ☐

alleged in this complaint arose was this defendant

Charge for A-cellhouse. At the time the claim(s)

Kansas and is employed as CS1 and Officer,

18) Defendant Austin is a citizen of El Dorado,

and in individual capacity.

acted under color of state law in both her official

all relevant times mentioned in this complaint. She

Ms. Lukostiwus a CS1 and Hearing Officer at

answer is "Yes," briefly explain:

under color of state law? Yes ☒ No ☐ If your

in this complaint arose was this defendant acting

law in both his official and individual capacity.

20) Defendant (fnu) Nexley is a citizen of El Dorado, Kansas and is employed as a Corrections Officer. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes" briefly explain:

Mr. Nexley was acting under color of state law in both his official and individual capacity.

21) Defendant (fnu) Cline is a citizen of El Dorado, Kansas and is employed as a Corrections Officer. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes" briefly explain:

Mr. Cline was acting under color of state law in both his official and individual capacity.

22) Defendant (fnu) Maunce is a citizen of El Dorado, Kansas and is employed as a Corrections Officer. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

Mr. Maunce was acting under color of state law in both his official and individual capacity.

23) Defendant (fnu) Stevenson is a citizen of El

Dorado, Kansas and is employed as a Corrections Officer. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:
Ms Stevenson was acting under color of state law in both her official and individual capacity.

24) Defendant (fnu) Latham is a citizen of El Dorado, Kansas and is employed as a Corrections Officer. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:
Mr. Latham acted under color of state law in both his official and individual capacity.

25) Defendant (fnu) Cervantes is a citizen of El Dorado and is employed as a Corrections Officer. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:
Ms Cervantes acted under color of state law in both her official and individual capacity.

26) Defendant (fnu) Tallman is a citizen of El Dorado, Kansas and is employed as a Corrections Officer. At the time the claim(s) alleged in this complaint

arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

Mr. Tallman was acting under color of state law in both his official and individual capacity.

27) Defendant (fnu) Cole is a citizen of El Dorado, Kansas and is employed as a Corrections Officer. At the time the claim(s) alleged in this complaint arose was this defendant acting under the color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

Mr. Cole was acting under color of state law in both his official and individual capacity.

28) Defendant (fnu) Miller is a citizen of El Dorado, Kansas and is employed as a Correctional Officer. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

Mr. Miller was acting under color of state law in both his official and individual capacity.

29) Defendant (fnu)(lnu) EAI Officer is a citizen of El Dorado, Kansas and employed as an Escort, Apprehension, Investigations Officer. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state

law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

Mr./Ms. EAI Officer was acting under color of state law in both his/her official and individual capacity.

30) Defendant (fnu) Weaver is a citizen of El Dorado, Kansas and is employed as a Food Service Director for Aramark. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

Mr. Weaver was acting under color of state law in both his official and individual capacity.

31) Defendant Julie Hay is a citizen of El Dorado, Kansas and is employed as an Assistant Food Service Director for Aramark. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

Ms. Hay was acting under color of state law in both her official and individual capacity.

32) Defendant (fnu) Macdonald is a citizen of El Dorado, Kansas and is employed as a Food Service Supervisor for Aramark. At the time the claim(s) alleged in this complaint arose was

this defendant acting under the color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

Mz Macdonald was acting under color of state law in both her official and individual capacity.

33) Defendant (fnu)(lnu) Food Service Supervisor - Main line is a citizen of El Dorado, Kansas and is employed as a Food Service Supervisor on the Main Line for Aramark. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

Mr./Mz Food Service Supervisor for Main Line was acting under color of state law in both his/her official and individual capacity.

34) Defendant (fnu)(lnu) Food Service Supervisor - Segregation line is a citizen of El Dorado, Kansas and is employed as a Food Service Supervisor on Segregation Line for Aramark. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:

Mr./Mz Food Service Supervisor for Segregation Line was acting in both his/her official and individual capacity.

35) Defendant (fnu) Chapman is a citizen of El Dorado, Kansas and is employed as a Director of Nursing for Centurion. At the time the claim(s) alleged in this complaint arose was this defendant acting under the color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:
Mz Chapman was acting under color of state law in both her official and individual capacity.

36) Defendant (fnu) Motter is a citizen of El Dorado, Kansas and is employed as an Advanced Registered Nurse Practitioner for Centurion. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:
Mz Motter was acting under color of state law in both her official and individual capacity.

37) Defendant (fnu) Myers is a citizen of El Dorado, Kansas and is employed as a Nurse for Centurion. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain:
Mz Myers was acting under color of state law in both her official and individual capacity.

38) Defendant (fnu) Plush is a citizen of El

Dorado, Kansas and is employed as a Nurse for Centurion. At the time the claim(s) alleged in this complaint arose. Was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain: Mr. Plush was acting under color of state law in both his official and indivdual capacity.

39) Defendant (fnu) Hickson is a citizen of El Dorado, Kansas and is employed as a Captain. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain: Mr. Hickson was acting under color of state law in both his official and individual capacity.

40) Defendant (fnu) Simpson is a citizen of El Dorado, Kansas and is employed as a CS1 and Officer in Charge of D-cell house. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain: Mr. Simpson was acting under color of state law in both his official and individual capacity.

41) Defendant (fnu) Rudd is a citizen of El Dorado, Kansas and is employed as a CS1 in D-cell house. At the time the claim(s) alleged in this

Complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain: Mr. Rudd was acting under color of state law in both his official and individual capacity.

42) Defendant (fnu) Darter is a citizen of El Dorado, Kansas and is employed as a Correctional Officer. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "Yes", briefly explain: Mr. Darter was acting under color of state law in both his official and individual capacity.

43) Defendant Rachel Hollingshead is a citizen of Kansas and is employed as Food Service Director at Lansing Correctional Facility for Aramark. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law? Yes ☒ No ☐. If your answer is "yes", briefly explain: Ms Hollingshead was acting under color of state law in both her official and individual capacity.

44) Defendant (fnu)(lnu) Food Service Supervisor Segregation Line is a citizen of Kansas and is employed by Aramark at Lansing Correctional Facility. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law?

Yes ☒ No ☐. If your answer is "yes", briefly explain:
hr/ns. Food Service Supervisor for segregation Line
was acting in both their official and individual
capacity.

45) Defendant Brian Reeves is a citizen of Kansas
and is employed as Unit Team Supervisor. At the
time the claim(s) alleged in this complaint arose
was this defendant acting under color of state law?
Yes ☒ No ☐. If your answer is "yes", briefly explain
Mr. Reeves was a Unit Team Supervisor at all relevant
times mentioned in this complaint. He was acting in
both his official and individual capacity.

46) Defendant Jeremy Hoepner is a citizen of Kansas
and is employed as a Unit Team Manager. At the
time the claim(s) alleged in this complaint arose was
this defendant acting under color of state law?
Yes ☒ No ☐. If your answer is "yes", briefly explain:
Mr. Hoepner was a Unit Team Manager at all relevant
times mentioned in this complaint. He was acting in
both his official and individual capacity.

47) Defendant (fnu) Ball is a citizen of Kansas and
is employed as a Deputy Warden at LCF. At
the time the claim(s) alleged in this complaint
arose was this defendant acting under color of
state law?
Yes ☒ No ☐. If your answer is "Yes", briefly explain:

(fnu) Ball was a Deputy Warden at LCF at all relevant times mentioned in this complaint. He acted in both his official and individual capacity.

40) Defendant (fnu) Cheeks is a citizen of Kansas and is employed as the Warden of LCF at all relevant times mentioned in this complaint. At the time the claim(s) alleged in this complaint arose was this defendant acting under color of state law?

Yes ☒ No ☐. If your answer is "Yes" briefly explain Mr. Cheeks acted in his official and individual capacity as the Warden of LCF.

## C. CAUSE OF ACTION

1) I allege that the following of my constitutional rights, privileges or immunities have been

violated and that the following facts form the basis for my allegations: (If necessary you

may attach up to two additional pages (8h" x 11") to explain any allegation or to list

additional supporting facts.)

A) (1) Count I: SDC Jeff Zmuda violated my 8th amendment rights under the U.S. Constitution

(2) Supporting Facts: (Include all facts you consider important, including names of

persons involved, places and dates. Describe exactly how each defendant is involved.

State the facts clearly in your own words without citing legal authority or argument.):

(See attatched) (See attatched)

B) (1) Count II: CM Libby Keogh violated my 8th amendment rights under the U.S. Constitution

(2) Supporting Facts: (See attatched) (see attatched)

C) (1) Count III: _CM Darcie Holthaus violated my 8th amendment rights under the U.S. Constitution_

(2) Supporting Facts: _(see attached)_

## D. PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF

1) Have you begun other lawsuits in state or federal court dealing with the same facts involved in this action or otherwise relating to the conditions of your imprisonment? Yes ☒ No☐ . If your answer if "Yes", describe each lawsuit. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

a) Parties to previous lawsuit:

Plaintiffs: _Christopher Erwin_

Defendants: _Jeff Zmuda_

b) Name of court and docket number _Leavenworth County District 1 (was transfered from Butler CO, KS) Case # 2021 - CV - 000096_

c) Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?) _Pending_

d) Issues raised _Habeus Corpus_

e)  Approximate date of filing lawsuit ___6/10/2021___

f)  Approximate date of disposition ___Done yet as of today 8/15/22___

1)  I have previously sought informal or formal relief from the appropriate administrative

officials regarding the acts complained of in Part C Yes ☒ No ☐ . If your answer is

"Yes", briefly describe how relief was sought and the results. If you answer is "No",

briefly explain why administrative relief was not sought.

___I properly grieved all issues using the KDOC grievance procedure___
___for inmates in the Inmate Rule Book as Revised 10/2019.___
___I recieved dispositions from the Secretary of Corrections___
___on all issues raised in this case.___

## 2)  REQUEST FOR RELIEF

1)  I believe that I am entitled to the following relief:

___(Please See attached)___

_____

_____

_____

_____

_____        _____#123078___

Signature of Attorney (if any)                          Signature of Plaintiff

_____

_____

(Attorney's full address and telephone number)

XE-2 8/82            CIVIL RIGHTS COMPLAINT §1983            5

D) Previous Lawsuits and Administrative Relief continued.

g) Parties to Previous Lawsuit:

Plantiffs: Christopher Erwin

Defendants: Jeff Zmuda

h) Name of Court and docket number:

Leavenworth County District 1 case # 2022-CV-137

i) Disposition: Pending

j) Issues raised: Habeas Corpus

k) Approximate date of filing: May 24, 2022

l) Approximate date of disposition: None yet as of 8/15/22

2) Request For Relief continued...

1) I believe I am entitled to the following relief:

a) The Carbohydrate info for each item on the 2200 diabetic menu

b) A minimum of 3oz shelf stable protein in my 2200 snack sack at dinner.

c) My strict diet portions as prescribed and as stipulated by the ACB Dietician

d) Regular timing of both meals and insulin each day

e) My scrotal support device as prescribed

f) $100,000 punitive damages from Centurion defendants

g) $200,000 punitive damages from Aramark defendants

h) $300,000 punitive damages from KDOC defendants.

i) I'd like a jury to decide my case please

pg. 6

Count 1 continued...

A) Per 75-5251 of the 2019 Kansas Statutes:

The secretary (of corrections) shall have power, and it shall be the secretary's duty from time to time, to examine and inquire into all matters connected with the government and discipline of the correctional institutions and release supervision services under the secretary's supervision and control; the punishment and employment of the inmates, and releasees under the secretary's supervision and the purchases and sales of the articles provided for such correctional institutions and parole offices or sold on account thereof; and the secretary may from time to time require reports from the warden, parole director, or other officers of any such correctional institution or parole office in relation to any or all such matters. It shall be the secretary's duty to inquire into any improper conduct which may be alleged to have been committed by the warden, parole director or any other officer of any such correctional institution or parole office; and for that purpose the secretary shall have power to issue subpoenas to compel the attendance of witnesses, and the production of papers and writings in the same manner and with like effect as in cases of arbitration. The secretary may administer oaths to any such witnesses before examination thereof.

The secretary shall have free access to the correctional institutions and parole offices at all times, and it shall be the duty of the warden, parole director, and other officers of any such correctional institution or parole office, whenever requested, to exhibit to the secretary, on demand, all the books, papers, accounts and writings pertaining to the correctional institution or parole office, or to the business, government,

www.PrintablePaper.net discipline or management thereof; and to render to the secretary every other facility in their power

pg. 7

to enable the secretary to discharge the secretary's duties under this act.

The secretary shall adopt rules and regulations or policies for the direction and government of such correctional institutions and the officers thereof, and may change the same from time to time.

B) Per KSA 75-5210:

(a) Persons committed to the institutional care of the secretary of corrections shall be dealt with humanely, with efforts directed to their rehabilitation and return to the community as safely and ~~institutions~~ promptly as practicable. For these purposes, the secretary shall establish programs of classification and diagnosis, education, casework, mental health, counseling and psychotherapy, chemical dependency counseling and treatment, sexual offender counseling, prerelease programs which emphasize re-entry skills, adjustment counseling and job placement. ~~...~~ The secretary shall maintain a comprehensive record of the behavior of each inmate reflecting accomplishments and progress toward ~~...~~ rehabilitation as well as charges of infractions of rules and regulations, punishments imposed and medical inspections made ~~...~~

(c) The secretary, with the cooperation of ~~the~~ department of health and environment, shall adopt rules and regulations establishing and prescribing standards for health, medical and dental services for each institution, including preventative, diagnostic and therapeutic measures on both an outpatient and a hospital basis, for all types of patients. An inmate may be taken, when necessary, to a medical facility outside the institution.

Per KDOC Inmate Rule Book revised June 10, 2019:
Article 15 - Grievance Procedure for Inmates and Parolees

www.PrintablePaper.net KAR 44-15-101 ~~(a)~~ (b) ... An inmate in a facility or parole setting shall contact the the unit team members for

Pg. 8

the attempt at informal resolution. That attempt shall be documented. The facility's inmate request forms may be used to document this process. If this informal resolution attempt fails, the grievance system may then be used. If an emergency exists and a resolution could not be obtained by going to the unit team, the inmate may go directly into the grievance process.

(c) At each stage, all grievances shall be answered in as short a time as possible to insure that delay will not impose additional hardship upon the inmate or unnecessarily prolong a misunderstanding. Grievances of inmates who have since been transferred, paroled, or discharged shall be answered to the extent possible.

(d) The grievance procedure shall incorporate several levels of problem solving to assure solution at the lowest administration level possible.

(1) Level 1. The inmate shall first submit the grievance report form to an appropriate unit team member of the facility.

(2) Level 2. The inmate shall then submitt the grievance report form to the warden of the facility.

(3) Level 3. If not resolved, the grievance may be next submitted to the office of the secretary of corrections. Either a response to the grievance or referral of the matter to a deputy secretary of corrections for additional investigation, if necessary, shall be made by the warden. Grievances of inmates may be referred by the secretary to the deputy secretary of corrections for facility management.

(f) No staff member shall refuse to sign, date, and return an inmate request form, an inmate grievance form, or a grievance receipt slip showing that the inmate came to that person for assistance.

D) KAR 44-15-101a.

(c) All employees of the facility who are directly involved in the operation of the grievance procedure

pg 9

Shall recieve training in the skills necessary to operate, or participate in, the grievance procedure.

(d) (1) The grievance procedure shall be applicable to a broad range of matters that directly affect the inmate, including the following

(A) Complaints by inmates regarding policies and and conditions within the jurisdiction of the facility or the department of corrections; and

(B) actions by employees and inmates, and incidents occuring within the facility.

(2) The grievance procedure shall not be used in any way as a substitute for, or as part of, the inmate disciplinary procedure, the classification decision-making process, or the property loss or personal injury claims procedure, or the procedure ...

(e) The remedies available to the inmate may include action by the warden of the facility to correct the problem or action by the secretary of corrections to cause the problem to be corrected. Relief may include an agreement by facility officials to remedy an objectionable condition within a reasonable, specified time, or to change a facility policy or practice.

(f) A procedure shall be established by the warden for investigating the allegations and establishing the facts of each grievance. An inmate or employee who appears to be involved in the matter shall not participate in any capacity in the resolution of the grievance.

(g) A copy of the grievance response at each level shall be delivered to the unit team, to the inmate, and to the warden last responding.

(E) KAR 44-15-101b ... An inmate may move to the next stage of the grievance procedure if a timely response is not recieved at any step in the grievance process, unless an extension of time for the response

www.PrintablePaper.net

pg. 10

is agreed to in writing by the inmate and staff person answering the grievance.

F) KAR 44-15-102 (a) Grievance step one: preliminary requirements, informal resolution and problem solving at unit team level.

(1) Each inmate shall first seek information, advice, or help on any matter from the inmate's unit team, or from a member of the team. If unable to solve the problem, the unit team shall refer the inmate to the proper office or department...

(2) If an inmate does not recieve a response from the unit team within 10 calendar days, a grievance report may be sent to the warden without the unit team signature or signatures. Each grievance report form shall include an explanation of the absence of the signature or signatures.

(b) Grievance step two: complaint to the warden. If any inmate recieves a response but does not obtain a satisfactory solution to the problem through the informal resolution process within 10 calendar days, the inmate may fill out an inmate grievance report form and submit it within three calendar days after the deadline for informal resolution, to a staff member for transmittal to the warden.

(1) The inmate shall attach a copy of each inmate request form used to attempt to solve the problem and indicate on the inmate grievance report the following information:

(A) A specific complaint that states what or who is the subject of the complaint, related dates and places, and what effect the situation, problem, or person is having on the inmate that makes the complaint necessary;

(B) the title and number, if possible, of any order or regulation that could be the subject of the complaint;

www.PrintablePaper.net

pg. 11

(C) the action that the inmate wants the warden to take to solve the problem.

(D) the name and signature of the responsible institution employee or employees or of the parole officer from whom the inmate sought assistance. This signature shall be on either an inmate request form or the grievance report form. The date on which the help was sought shall be entered by the employee on the form; and

(E) the date on which the completed grievance report was delivered to the staff member for transmittal to the office of the warden.

(2) The staff member shall forward the report to the warden before the end of the next working day and shall give a receipt to the inmate.

(3) Warden's response.

(A) (i) Upon receipt of each grievance report form, a serial number shall be assigned by the warden or designee, and the date of receipt shall be indicated on the form by the warden or designee.

(ii) Each inmate grievance shall be returned to the inmate, with an answer, within 10 working days from the date of receipt.

(B) Each answer shall contain findings of fact, conclusions drawn, the reasons for those conclusions, and the action taken by the warden.

(C) In all cases, the original and one copy of the grievance report shall be returned by the warden to the inmate.

(D) A second copy shall be retained by the warden.

(E) Each facility shall maintain a file on grievance reports indexed by inmate name and subject matter.

(F) Any grievance report form may be rejected by the warden if the form does not document any Unit team action as required for the preliminary informal resolution process. The grievance report

pg. 12

form shall then be sent back to the unit team for an immediate answer to the inmate.

(6) If no response is recieved from the warden in the time allowed, any grievance may be sent by an inmate to the secretary of corrections with an explanation of the reason for the delay.

(c) Grievance step three: appeal to the secretary of corrections.

(1) If the warden's answer is not satisfactory, the inmate may appeal to the secretary's office by indicating on the grievance appeal form exactly what the inmate is displeased with and what action the inmate believes the secretary should take. The inmate's appeal shall be made within three calendar days of reciept of the warden's decision, or with three calendar days of the deadline for that decision, whichever is earlier.

(2) The appeal shall then be sent directly and promptly by U.S. mail to the department of corrections central office in Topeka.

(3) When an appeal of the warden's decision is made to the secretary, the secretary shall have 20 working days from reciept to return the grievance repot form to the inmate with an answer. The answer shall include findings of fact, conclusions made, and actions taken.

(4) If a grievance report form is submitted to the secretary without prior action by the warden, the form may be ~~sent~~ returned to the warden. If the warden did not respond in a timely manner, the form shall be accepted by the secretary.

(5) An appropriate official may be designated by the secretary to prepare the answer.

(d) General provisions: page limits; partial

pg. 13

responses; repetitive filings.

(1) At each step of the grievance procedure, the total number of pages of inmate grievance text shall not exceed 10 pages. Text appearing on the front and back of a page shall count as two pages. Any page of text beyond 10 pages shall not be considered when determining the merits of the grievance.

(2) Responding to parts . . .

(3) No offender shall abuse the grievance system by repeatedly filing the same complaint.

(A) Each offender who has been identified as being abusive of the grievance system by filing the same complaint on more than one occasion shall be notified in writing of this finding by the warden or secretary's designee responsible for responding to inmate grievance appeals who recieves the repeated filing.

(i) The notification shall be given at the time of the repeated filing.

(ii) The repeated filing shall be returned to the offender with the notification but without further response.

(iii) The notification shall contain . . .

(B) If, following this notification, an offender continues...

(C) Upon the finding ~~of~~ by the secretary of an abusive . . .

(D) Any application for sanctions submitted . . .

(G)  KAR 44-15-104 (a) Inmates, No adverse action shall be taken against any inmate for use of the grievance
Pg. 14  procedure . . .

H) KAR 44-15-105.(a) Nature. Records regarding the filing and disposition of grievances shall be collected and maintained systematically by the Correctional facility. These records shall be preserved for at least three years following final disposition...

KAR 44-15-106. "Emergency Grievances" shall mean those grievances for which disposition according to the regular time limits would subject the inmate to a substantial risk of personal injury, or cause other serious and irreparable harm to the inmate. In emergency situations the inmate may bypass the ~~prerequisite~~ prerequisite of informal resolution if going to the Unit team would not obtain a solution to the problem... Emergency grievances shall be forwarded immediately, without substantive review, to the level at which corrective action can be taken. Emergency grievances shall be expedited at every level...

I) KDOC IMPP 10-106D Program and Services: Standardized menu, ensuring nutritional adequacy of diets, and meal service schedules date 9-29-15;
Policy Statement: "All departmental food service operations shall follow a standardized menu that shall... Incorporate the MyPlate guidelines published by the USDA and be in compliance with recommended dietary allowances published by the National Academy of Sciences... (NCCHC P-46).

pg.15  Food shall not be withheld from offenders as a disciplinary sanction (ACA 4-4320 & 4-JCF-3B-05).

1

Definitions: Contract Monitor: The staff member designated by the Deputy Secretary of Facilities Management to monitor the quality and quantity of food service contract delivery, provide input with regard to the development of modified diets, and to facilitate decisions and coordinate standardized departmental food service management.

Departmental Clinical Health Authority: The physician Medical Director (Regional Medical Director) of the agency or organization responsible for the provision of health care services for the KDOC. This position has full clinical autonomy and responsibility for clinical health care issues within the KDOC.

Director of Health Care Services: Acts as the administrative health authority for the Department. This position manages health care systems, directs the health care services model, and has final approval on all policies and procedures in the health care system.

Facility Administrative Health Authority: The Health Services Administrator responsible for the provision of health care services at a facility. The Facility Health Authority works under the direction of the Departmental Clinical Health Authority and the Regional Vice President or designee administratively.

Facility Clinical Health Authority: The site physician Medical Director responsible to the Departmental Clinical Health Authority for all clinical matters and to the Health Services Administrator for all administrative matters.

Health Care Practitioner: A person who has met the requirements of and is engaged in the practice of medicine, dentistry, or nursing.

Individualized Diet: An adaptation of the medical or religious-type modified diet prescribed to meet specific needs, which are not addressed by the standardized modified diet.

Modified Diets: Diets most commonly prescribed to meet offenders' medical, dental, therapeutic, or religious needs;

developed from written instructions provided by the treating physician, dentist, Health Services Administrator, and/or Chaplain and which conform as closely as possible to the standardized menu. More specific modified diets are prescribed as individualized diets.

Registered Licensed Dietician: A person registered by the American Dietetic Association or who has the documented equivalent in education, training, or experience, with evidence of relevant continuing education; and who is licensed by the State of Kansas to practice dietetics.

Contract Staff and Responsibilities ... Planning and developing a standardized menu ... The finalized menu shall be reviewed and approved by the Deputy Secretary of Facilities Management, with input from the Contract monitor and Department's contracted, registered-licensed dietician.

Provisions Ensuring Nutritional Adequacy and Variety in the Menu ...

All food items shall be prepared in accordance with the stated ingredients of the recipes, with adjustments made for yields appropriate to the facility ...

Copies of all menus, including modified and individualized diets, shall be retained by the facilities for the contract monitor's review, along with documentation of deviations from the menu as served. ..

Provisions Ensuring Nutritional Adequacy in Modified Diets:

Individualized diets may be written and prescribed by the treating physician and/or dentist, when the offender's specific need cannot be met by a standardized modified medical diet. ..

All individualized diet prescriptions shall be specific and as complete and as simple as possible while adhering as closely as possible to the standardized modified menu. ..

Preparation and Serving of Modified Diets: Senior food service staff shall be trained by the contractor's Registered Dietician for the provision of the medical diets.

Establishing Meal Schedules: The menu shall be established on a 5 week rotating cycle to provide for sufficient advance planning and preparation, consistent with applicable health, sanitation, and safety codes...

Each facility shall establish routine meal service schedules consistent with the policy established by this IMPP...

With the exception of variations for weekend or holiday service Schedules approved by the Deputy Secretary of Facilities Management or Deputy Secretary of Juvenile Services, at least (3) meals (including two (2) hot meals) shall be served at regular times during each 24-hour period, with no more than 14 hours between the evening meal and breakfast.

J) IMPP 12-120A issued 3-10-2021..., Post-Intake Property...

Residents in disciplinary segregation are only to have access to the basic personal hygiene items as allowed by IMPP's 12-127 and 20-101A.

Residents placed in administrative restrictive housing after the effective date of this policy are allowed only the property listed in Attachment J, which may be further limited by facility general order.

Attachment J exhaustively lists allowed property in restrictive housing and doesn't allow any food items at all.

K) IMPP 11-101 Offender Privileges and Incentives...
Progression Through Levels.., Intake Level..., Upon admission to the Department at an intake facility, offenders shall be assigned to the Intake Level.., While at the Intake Level, inmates are limited to up to $10.00 per pay period

pg.18

in canteen expenditures for those items identified in Section V.B.1.a. of this IMPP. (This section is about disciplinary segregation allowable property available for purchase through the canteen)

V.B.1.a. Canteen expenditures, as authorized by the facility warden but, if authorized by the facility warden, shall not to exceed $10.00 per payroll period and shall be used for the purchase of the following items only... (none of which are food).

L) IMPP 10-122 Access to and Availability of Health Care Services... Emergency Care Services... Emergency health care services shall be provided to inmates in accordance with IMPP 10-114.

Sick Call and Physician's Clinic... Emergency sick call shall be available to all inmates at each facility 24 hours a day, 7 days a week, by health care staff. Arrangements shall be made to provide sick call services in the place of an inmate's detention if the inmate's custody status precludes attendance at sick call. A physician, physician's assistant, or advanced registered nurse practitioner shall be on site to see inmates at a minimum of three and one half hours per week per one hundred (100) inmates...

Special Needs Services... Individual treatment plans shall be written by a physician or another qualified health care staff with instructions regarding the inmate's diet, exercise and adaptation to the correctional environment, and medication.

Unimpeded Access to Health Care Services. ... Every non-emergency health request/referral from any inmate. or departmental staff shall be reviewed, tofaged, and investigated by health care staff within 24 hours of reciept of the request/referral. Within the next 24 hours or 72 hours on weekends, the inmate shall be seen by a health care staff. .. When qualified health care personnel are not available, Non-health trained facility staff shall ensure inmate's timely access to an appropriate level of health care provider.

M) Aramark Correction Services (ACS) Snack Diet Sheet. ... Diabetic (All calorie Levels) P.M. Snack 2oz Meat/ Meat Equivalent *, 2 Sl Bread, 1 fruit. .. *2oz of Meat/Meat Equivalent for Diabetic Snack = 2oz Turkey (white roll or combo roll), 4 Tbsp Peanut Butter, or 2 ea Hard Cooked Egg.

N) Diet Guide. For Diet Sheets Kansas DOC & Males Fall Winter. Created 9/18, 9/19 (5 week menu, each meal leaves out all breads, fruits, milk, juice, coffee, tea, leaves out portion sizes, quantities of items, and contains no calorie or carbohydrate information).

O) Diet Sheet. No added margarine, salt or pepper. ... "Copy of Kansas DOC Diet Load Sheets Male Main Menu Fall Winter 2020-21.xls" → (at bottom center of each page) ... 5 week menu, 105 pages, each page is one meal on one day and lists everything on

the meal tray for CV's, 1800, 2200, 2500, 2800 diets
as well as pregnancy, High protein / High Calorie, High
Fiber, Milk-Intolerance, and dental soft diets.
Sugar substitute, Pepper, Jelly, Margarine, White Bread,
Fruit or 100% juice, Hot Cereal, Peanut Butter, Regular
Coffee, and Low Fat Milk are the catagories on each
of the 105 sheets. The only difference is on Saturday
at breakfast instead of Hot Cereal it says Unsweetened
Dry Cereal. It lists quantities of each item, portion
sizes in appropriate units (cups, oz, each, slices, none)
Including when something should be left off tray,
that all white bread is "sl" or sliced, and if it
should be "Same As General Menu" as it says <u>only</u> for
Sugar Substitute w/o exception on all 105 sheets.

P) Aramark Correctional Services Kansas DOC Medical
Nutrition Therapy and Religious Meals Manual Revised
10/2019 :

Authorization Forms ; This Diet Manual will be used for
the Kansas DOC as a reference by the Medical Department.
Attending Physicians, Aramark Registered Dieticians, and Front
Line Manager to order, plan, and administer the medical
diet program. Date: June 1, 2017.

Policies and Procedures : Aramark Dieticians ...
Aramark Correctional Services employs the Nutrition and
Operational Support Services (NOSS) Department made

pg 2

up of Registered Dieticians who are dedicated solely to the correctional industry and secured environments. They are responsible for menu planning for the general population, as well as for therapeutic diet needs, in accordance with the standards set by the American Corrections Association and the National Commission of Correctional Health Care.

For assistance with diets or variations of diets not covered in this Manual, Front Line Managers may need to contact their Aramark Registered Dietician. To locate the contact information for dieticians who cover your region, please visit the Correctional Services page on Aramark.net or contact your District Manager.

If a medical practitioner would like to speak to a dietician, please provide that person with your dietician's telephone or email contact,

Front Line Managers — For additional information regarding the contents of any medical or religious diet, contact your Regional Dietician for assistance.

Standard Diet Procedures ... Medical Diet Orders ...

All medical diets are ordered and cancelled by an authorized medical practitioner in a dated entry in the resident's medical record in addition to communicating the diet order to food services via an agreed upon transmittal system (reference #4 for methods).

DW22

Resident Information ... Grievances related to food Service are submitted in writing with a copy provided to the Front Line Manager who responds in writing after consultation with Aramark Correctional Services Registered Dietrician.

Diet Meal Plans/Sheets ... The Diet Sheets are a Series of diet-specific production sheets planned for every meal served. They are developed by Aramark Correctional Services Registered Dietricians for each facility in accordance with this Diet Manual. The Diet Sheets and Patterns detail the food items and portions to be served for each diet meal.

Timeliness Or Transmittal Diet Orders /Cancellations/ Transfers: For preparation purposes, all transmittal diets orders /cancellations, or transfer information should be recieved four hours before scheduled tray assembly.

Aramark Management Responsibilities ... Train staff in properly preparing and serving non-standard diets. .. Assure diet trays and beverages are properly labelled ... Assure that a trained Aramark employee compares all diet trays assembled with Diet Meal Patterns and Diet Sheets ... Notify their Aramark Regional Dietrician if there is a need for a therapeutic or religious diet for which instructions have not been provided within

Pg. 23

this Diet Manual... Procedures for Non Standard Diet Orders (Diets not included on Diet Sheets or within this Diet Manual): ... If you are unable to reach an Aramark dietician, contact your district manager to assist in contacting your dietician..., ~~substitute~~ Provide night sacks as needed for medical diets... Substitutions on Diets should be avoided but must comply with the diet restrictions/modifications included in this manual if they must be done ... Document all formal diet concerns/complaints, including your response.

Menu Overview... Diet Meal Patterns: In addition to the Regular Menu, Aramark provides diet meal plans, which are used to serve nutritionally appropriate meals for documented medical and religious needs...

The Diet Menu: Written to mimic the regular menu as closely as possible, with modifications to reduce sodium, fat, and simple sugars, More consistent in type and number of items than the regular menu. to assure greater accuracy in preparation and service, Located on the top of the daily Diet Sheets, Include the Cardiac Diet and Diabetes Diets...

Summary of Standard Diets: Medical Diets:

| Diet | Purpose/Indication | Nutritional Description |
|---|---|---|
| Diabetic/Calorie Control Diet | Insulin Dependent diabetic or non-insulin dependent requiring strict control | Approximately: 50-60% CHO 15-20% Protein 25-35% Fat Reduced Sodium |
| Finger Foods | To provide safe environment for inmates on suicide precautions (direct observation) | Approximately the same calorie level as the regular inmate diet. Consists of foods easily eaten without utensils |

Diabetic/Calorie Controlled Diet:
For Residents: With Type 1 (Insulin Dependent) diabetes mellitus or Type 2 (Non-Insulin Dependent) diabetes requiring strict blood sugar control.

Nutritional Description: Approximately 50-60% Carbohydrates, 15-20% protein, and 25-35% fat. Sodium level is below 3000 milligrams, if individual does not add salt (salt is not offered as part of these calorie controlled diets).

pg 25

DIABETIC/CALORIE CONTROLLED DIET (Continued)

### FOOD LISTS FOR DIABETES

Meals are planned using four different categories or groups of foods.  Foods within each group are similar in calorie, protein, carbohydrate, and fat level.  This similarity allows meals to be patterned by specified numbers of standard portions for each food group.  The pattern is defined into actual menu items by *exchanging* the similar food items within each food group for each meal.

The four groups include:        Carbohydrates                    Proteins
                                Fats                             Alcohol

### ONE (1) CHOICE = ONE (1) STANDARD PORTION

**The Diabetic/Calorie Controlled Diet offers a specified amount of syrup on the diet plans when on regular menu. *1 Tablespoon or ½ oz of regular pancake syrup is counted as 1 choice (15 grams of carbohydrate)*

### FOOD LIST FOR DIABETES

(Revised 2014, American Diabetic Association and the American Dietetic Association)

| Food List | Carbohydrates (grams) | Protein (grams) | Fat (grams) | Calories |
|---|---|---|---|---|
| **Carbohydrates** | | | | |
| Starch: breads, cereals and grains, starchy vegetables, crackers, snacks and beans, peas and lentils | 15 | 3 | 1 | 80 |
| Fruits | 15 | -- | -- | 60 |
| Milk | | | | |
| Fat-free, low-fat, 1% | 12 | 8 | 0-3 | 100 |
| Reduced-fat, 2% | 12 | 8 | 5 | 120 |
| Whole | 12 | 8 | 8 | 160 |
| Sweets, Desserts, and Other Carbohydrates | 15 | varies | varies | varies |
| Nonstarchy Vegetables | 5 | 2 | -- | 25 |
| **Proteins** | | | | |
| Lean | -- | 7 | 2 | 45 |
| Medium-fat | -- | 7 | 5 | 75 |
| High-fat | -- | 7 | 8 | 100 |
| Plant-based proteins | varies | 7 | varies | varies |
| **Fats** | -- | -- | 5 | 45 |
| **Alcohol** | varies | -- | -- | 100 |

\* Protein calculations used in diabetic patterns are based on choices and a composite of our specific products



## NUTRIENT SUMMARY FOR DIABETIC MENU PATTERNS

### 1800 Diabetic Meal Pattern (3 hot meals)

| Meal: | Carbohydrates (grams) |
|-------|-----------------------|
| Breakfast | 55-60 |
| Lunch | 55-65 |
| Dinner | 60-75 |
| Snack | 45-60 |
| Totals: | 215-260 |

### 2200 Diabetic Meal Pattern (3 hot meals)

| Meal: | Carbohydrates (grams) |
|-------|-----------------------|
| Breakfast | 70-85 |
| Lunch | 85-100 |
| Dinner | 85-100 |
| Snack | 45-60 |
| Totals: | 295-445 |

### 2500 Diabetic Meal Pattern (3 hot meals)

| Meal: | Carbohydrates (grams) |
|-------|-----------------------|
| Breakfast | 95-100 |
| Lunch | 90-105 |
| Dinner | 90-105 |
| Snack | 45-60 |
| Totals: | 320-540 |

### 2800 Diabetic Meal Pattern (3 hot meals)

| Meal: | Carbohydrates (grams) |
|-------|-----------------------|
| Breakfast | 110-120 |
| Lunch | 110-125 |
| Dinner | 110-125 |
| Snack | 45-60 |
| Totals: | 375-430 |

Note: Physicians, medical practitioners and insulin-dependent diabetics can utilize the carbohydrate grams in order to calculate appropriate dosage and timing of medication.

Most meals will fall within the ranges above though there may be a few exceptions as the regular menu is used as a base



# References – Diabetic/Calorie Controlled Diet

The Academy of Nutrition and Dietetics. Nutrition Care Manual®. Diabetes Mellitus Type 1: Nutrition Prescription.
https://www.nutritioncaremanual.org/topic.cfm?ncm_category_id=1&lvl=5517&lv2=18399&ncm_toc_id=18399&ncm_heading
=Nutrition%20Care. Accessed October 6, 2014

The Academy of Nutrition and Dietetics. Nutrition Care Manual®. Diabetes Mellitus Type 2: Nutrition Prescription.
https://www.nutritioncaremanual.org/topic.cfm?ncm_category_id=1&lvl=5517&lv2=18469&ncm_toc_id=18469&ncm_heading
=Nutrition%20Care. Accessed October 6, 2014

The Academy of Nutrition and Dietetics. Nutrition Care Manual®. Diabetes Mellitus Type 1: Meal Planning.
https://www.nutritioncaremanual.org/topic.cfm?ncm_category_id=1&lvl=5517&lv2=18399&ncm_toc_id=18399&ncm_heading
=Nutrition%20Care. Accessed October 6, 2014

The Academy of Nutrition and Dietetics. Nutrition Care Manual®. Diabetes Mellitus Type 2: Meal Planning.
https://www.nutritioncaremanual.org/topic.cfm?ncm_category_id=1&lvl=5517&lv2=18469&ncm_toc_id=18469&ncm_heading
=Nutrition%20Care. Accessed October 6, 2014

Executive Summary: Standards of Medical Care in Diabetes-2010. *Diabetes care*, Vol. 33 Suppl 1 (January 2010).
http://care.diabetesjournals.org/content/33/Supplement_1/S4.full.pdf+html. Accessed July, 26 2010.
Diabetes Management in Correctional Institutions-2009. *Diabetes care*, Vol. 32 Suppl 1 (January 2010).
http://care.diabetesjournals.org/content/32/Supplement_1/S73.full.pdf+html. Accessed July, 26 2010.

*Choose Your Foods: Exchange Lists for Diabetes*, 2014: Description and Guidelines for Use. American Diabetic Association and
the American Dietetic Association. Madelyn L. Wheeler, MS, RD, FADA, Anne Daly, MS, RD, Alison Evert, MS, RD, Marion
J. Franz, MS, RD, Patti Geil, MS, RD, FADA, Lea Ann Holzmeister, RD, Karmeen Kulkarni, MS, RD, Emily Loghmani, MS,
RD, Tami A. Ross, RD, Pamela Woolf. June 2014

   "Reproduction of the Exchange Lists in whole or part, without permission of The American Dietetic Association or the
American Diabetes Association, Inc. is a violation of federal law. This material has been modified from *Choose Your Foods:
Exchange Lists for Diabetes*, which is the basis of a meal planning system designed by a committee of the American Diabetes
Association and The American Dietetic Association. While designed primarily for people with diabetes and others who must
follow special diets, the Exchange Lists are based on principles of good nutrition that apply to everyone. Copyright © 2014 by
the American Diabetes Association and The American Dietetic Association."

The Academy of Nutrition and Dietetics.  Position of the American Dietetic Association and American Society for Nutrition Joint
Position: Obesity, reproduction, and pregnancy outcomes. *J Am Diet Assoc.* 2009;109:918-927

Recipes and Special Purchases : Lists specific items on diet, PRIMA Recipe #, and a Recipe Portion (with an asterik next to it). On the next page at the bottom the asterik is defined as:

* Standard portion in the recipe, if a different portion is needed then scale the recipe in PRIMA Web to correction portion.

So, as an example, the listing for AuGratin Potatoes has a PRIMA Recipe # of M2931 and the given recipe portion is listed as 1 cup. This seems to indicate the formula to be used by diabetics to determine carb amounts in each food item listed on page 26 of the ACS MNT Manual, which says "One (1) Choice = One (1) Standard Portion" would mean that 1 cup of AuGratin Potatoes is equal to 15 carbs per the Food List For Diabetes also on page 26 of that manual. This is of course absurdly wrong.

pg. 29

RECIPES & SPECIAL PURCHASES

## PRIMA WEB RECIPES
**The printed recipes in this manual are current as of the publication date and subject to change. Please refer to PRIMA Web for the most current recipe.**

**This is not an all-inclusive list of diet recipes but just a quick reference guide.  Please contact your regional RD with questions about specific diet recipes.**

| Item on diet | PRIMA Recipe # | Recipe Portion* |
|---|---|---|
| Scrambled Eggs | M4868 | 2 ozw |
| Hard Cooked Eggs | M181 | 1 each |
| Peanut Butter | M2726 | 1 ozw |
| Breakfast Sausage | M11452 | 1 patty |
| T. Ham | M677 | 1 ozw |
| Hot Turkey | M670 | 3 ozw |
| Cold Turkey | M2584 | 2 ozw |
| Fish Patty | M11430 | 1 patty |
| Chicken Patty | M11437 | 1 patty |
| Country Patty | M11428 | 1 patty |
| Meatloaf Patty | M11444 | 1 patty |
| Charbroiled Patty | M11458 | 1 patty |
| 100% Beef Patty | M10638 or M3266 | 1 patty |
| BBQ Beef Patty | M11454 | 1 patty |
| Meatballs (1/2 oz each) | M5811 | 6 each |
| Baked Chicken Quarter | M710 | 1 each |
| Unprocessed Turkey | M10894 | 3 ozw |
| Unprocessed Chicken (pulled or diced) | M3455 or M7954 | 3 ozw |
| Unprocessed Roast Beef | M475 | 3 ozw |
| Stew Beef (or beef cubes) | M492 | 3 ozw |
| Cod w/Margarine (Unbreaded Fish Fillet) | M11450 | 1 portion |
| Rinsed Tuna | M1401 | 2 ozw |
| Scratch Poultry Patty | M1199 | 3 ozw |
| Sloppy Joe | M2833 or M11982 | 4 ozw |
| Taco Filling | M2837 or M11981 | 4 ozw |
| Scalloped Potatoes | M1604 | 1 cup |
| AuGratin Potatoes | M2931 | 1 cup |
| Spaghetti with Tomato Sauce | M1595 | 1 cup |
| Meatless Chili | M5993 | 1 cup |
| Mac & Cheese | M1568 | 1 cup |
| Scratch Salad Dressing | M2836 | 1 fl oz |
| Gluten Free Soy Patty | M2509 | 3 ozw |
| Vegan Scratch Bean Patty | M4045 or M11531 | 1 each |
| Vegan Hummus | M2510 | ½ cup |

| Vegan Pinto Beans | M2002 | 1 cup |
|---|---|---|
| Vegan Lentils | M4181 | 1 cup |
| Vegan Navy Beans | M1785 | 1 cup |
| Vegan Black-eyed Peas | M1996 | 1 cup |
| Vegan Sloppy Joe | M5019 | 4 ozw |
| Vegan Soy Patty (hot or cold) | M8208, M2519, M9625, M10352 | 1 each |
| Management Loaf | M2788 | 1 serving |

### Clear Liquid Diet Recipes

| Item on diet | PRIMA Recipe # | Recipe Portion* |
|---|---|---|
| Beef Broth | M4648 | 8 fl oz |
| Chicken Broth | M4647 | 8 fl oz |

### Full Liquid (Broken Jaw) Diet Recipes

| Item on diet | PRIMA Recipe # | Recipe Portion* |
|---|---|---|
| Super Cereal | M4649 | 2 cups |
| Pasta Based Entrée | M4655 | 10/2 ozw |
| Rice Based Entrée | M4656 | 10/2 ozw |
| Potato Based Entrée | M4657 | 10/2 ozw |
| Pasta Based Salad | M4659 | 1 cup |
| Potato Based Salad | M4658 | 1 cup |
| Creamed Broccoli | M4654 | 1 cup |
| Creamed Carrots | M4652 | 1 cup |
| Creamed Green Beans | M4653 | 1 cup |
| Pureed Peanut Butter & Jelly | M4651 | 5 ozw |
| Canned Fruit | M4650 | ½ cup |
| Cake | M11532 | 1/60 cut |
| Brownie | M11533 | 1/40 cut |

* Standard portion in the recipe, if a different portion is needed then scale the recipe in
  PRIMA Web to correct portion

Pg 31

**MEDICAL DIET ORDER FORM**

## KANSAS DOC MEDICAL DIET ORDER

INMATE'S NAME (LAST NAME, FIRST NAME) _____     INMATE'S DOC NUMBER _____

INMATE'S BIRTH DATE _____     INMATE'S LOCATION _____

DIET START DATE _____     DIET END DATE _____

| | Code | |
|---|---|---|
| ☐ | CA | CARDIAC DIET |
| ☐ | D18 | 1800 DIABETIC / CALORIE CONTROLLED DIET (SNACK INCLUDED) |
| ☐ | D22 | 2200 DIABETIC / CALORIE CONTROLLED DIET (SNACK INCLUDED) |
| ☐ | D25 | 2500 DIABETIC / CALORIE CONTROLLED DIET (SNACK INCLUDED) |
| ☐ | D28 | 2800 DIABETIC / CALORIE CONTROLLED DIET (SNACK INCLUDED) |
| ☐ | SO GI | GI (Gastro-intestinal) SOFT DIET |
| ☐ | PR | PREGNANCY DIET (SNACK INCLUDED) |
| ☐ | HP | HIGH PROTEIN / HIGH CALORIE DIET (SNACK INCLUDED) |
| ☐ | HF | HIGH FIBER |
| ☐ | SO D | DENTAL SOFT |
| ☐ | RD1 | RENAL PRE-DIALYSIS (Restricted Protein) DIET |
| ☐ | RD2 | RENAL DIALYSIS (Increased Protein) DIET |
| ☐ | CL | CLEAR LIQUID DIET |
| ☐ | MI | MILK INTOLERANCE |
| ☐ | FL | FULL LIQUID (BROKEN JAW) DIET |
| ☐ | FF | FINGER FOODS DIET |
| ☐ | GR | GLUTEN RESTRICTED DIET |
| ☐ | SFA | SEVERE FOOD ALLERGY DIET |
| ☐ | HO | HOSPICE |
| ☐ | | OTHER_____ |

Comment: _____

_____

_____

AUTHORIZATION SIGNATURE _____

DATE REQUESTED _____

Revised 6/17

66

𝜌𝑔.32

Appendix – Recipes (page 68 of ACS MNT Manual)
Appendix – Diet Patterns (page 69 of ACS MNT Manual) Where the diet sheets come from.

(Q) American Diabetes Association Diabetes Plate Method:
The Diabetes Plate Method is the easiest way to create healthy meals that can help manage blood sugar. Using this method, you can create perfectly portioned meals with a healthy balance of vegetables, protein, and carbohydrates — without any counting, calculating, weighing or measuring. The plate for this method will be a round 9 inch diameter plate.

Fill half your plate with nonstarchy vegetables such as carrots, celery, tomatoes, broccoli, cauliflower, cabbage, green beans, snow peas. Nonstarchy vegetables are lower in carbohydrate, so they do not raise blood sugar very much. They are also high in vitamins, minerals, and fiber, making them an important part of a healthy diet.

Fill one quarter of your plate with lean protein foods such as lean beef, soy products, and cheese. Protein foods from animal sources usually contain saturated fat, which may increase your risk of heart disease. Lean proteins include chicken, turkey, eggs, salmon, tuna, cod, lean deli meats, lean beef, lean pork, nuts and nut butters, tofu, edamame, and plant based meat substitutes such as soy.

Fill one quarter of your plate with carbohydrate foods. such as grains like brown rice, oatmeal, bread, pasta, tortillas, green peas, potatoes, sweet potatoes, beans and legumes, fruits, dairy products like milk, yogurt. These foods have the greatest effect on blood sugar. Limiting your portion to one quarter of your plate can help keep blood sugars from rising too high after meals

Choose water or a low-calorie drink. Unsweetened tea, coffee, diet soda or other diet drinks.

R) American Diabetes Association Nutrition Therapy Recommendations for the Management of Adults with Diabetes & Diabetes Care 2014 Jan 37 (Supplement 1): S120-S143: For many individuals with diabetes, the most challenging part of the treatment plan is determining what to eat... The ADA also recognizes the integral role of nutrition therapy in overall diabetes management and has historically recommended that each person with diabetes be actively engaged in self-management, education, and treatment planning with his or her health care provider, which includes the collaborative development of an individualized eating plan.

Diabetes Self-management education/support: In addition to diabetes medical nutrition therapy provided by a Registered Dietician, diabetes self-management education and diabetes self-management support are critical elements of care for all people with diabetes and are necessary to improve outcomes in a disease that is largely self-managed.

Effectiveness of Nutrition Therapy: Nutrition therapy is recommended for all people with type 1 and type 2 diabetes as an effective component of the overall treatment plan. Individuals with diabetes should receive individualized medical nutrition therapy as needed to achieve treatment goals, preferably provided by an Registered Dietician familiar with the components of diabetes medical nutrition therapy. For individuals with type 1 diabetes, participation in an intensive flexible insulin therapy education program using the carbohydrate counting

Meal planning approach can result in improved glycemic control. For individuals using fixed daily insulin doses, consistent carbohydrates intake with respect to time and amount can result in improved glycemic control and reduce the risk for hypoglycemia.

Because diabetes nutrition therapy can result in cost savings and improved outcomes such as reduction in A1C, Nutrition therapy should be adequately reimbursed by insurance and other payers.

For individuals with Type 1 diabetes using multiple daily injections or continuous subcutaneous insulin infusion, a primary focus for nutrition therapy should be on how to adjust insulin doses based on planned Carbohydrate intake.

On average, it has been observed that people with diabetes (should) eat about 45% of their calories from carbohydrate, 36%-40% of calories from fat, and the remainder (16-18%) from protein.

The amount of of carbohydrates and available insulin may be the most important factor influencing glycemic response after eating and should be considered when developing the eating plan.

Monitoring carbohydrate intake, whether by carbohydrate counting or experience-based estimation, remains a key strategy in achieving glycemic control.

For ~~health~~ good health, carbohydrate intake from vegetables, fruits, whole grains, legumes, and dairy products should be advised over intake from other carbohydrate sources, especially those that contain added fats, sugars or sodium.

Despite the inconclusive results of the studies evaluating the effect of differing percentages of carbohydrates in people with diabetes, monitoring carbohydrate amounts is a useful strategy for improving postprandial glucose control. Evidence exists that both the quantity and ~~quality~~ type of carbohydrate in a food influence blood glucose level, and total amount of carbohydrate eaten is the primary predictor of glycemic response. In addition, lower A1C occurred in the Diabetes Control and Complications Trial intensive ~~treatment~~ group and the Dose Adjustment for Normal Eating trial participants who recieved Nutrition therapy that ~~focused~~ on the adjustment of insulin doses based on variations in carbohydrate intake and physical activity.

In Summary: Nutrition interventions should emphasize a variety of minimally processed nutrient-dense foods in appropriate portion sizes as part of a healthful eating pattern and provide the individual with diabetes with practical tools for day-to-day food plan and behavior change that can be maintained over the long term.

Diabetes Management in Correctional Institutions (Diabetes Care Volume 37, Supplement 1, January 2014):

Management Plan: Glycemic control is fundamental to the management of diabetes. A management plan to achieve normal or near-normal glycemia with an A1C goal of <7% should be developed for diabetes management at the time of initial medical evaluation.

Nutrition and Food Services: The easiest and most cost-effective means to facilitate good outcomes in patients with diabetes is instituting a heart-healthy diet as the master menu. There should be consistent carbohydrate content at each meal, as well as a means to identify the carbohydrate content of each food selection. Providing carbohydrate content of food selections and/or providing in assessing carbohydrate content enables patients to meet the requirements of their medical nutrition therapy plan... Staff should also help in dietary management by offering healthy choices and listing the carbohydrate content of foods. ~~the~~

The use of insulin or oral medications may necessitate ~~the~~ snacks in order to avoid hypoglycemia. These snacks are part of ~~a~~ such patients' medical treatment plans and should be prescribed by medical staff.

Timing of meals and snacks must be coordinated with medication administration as needed to minimize the risk of hypoglycemia, as discussed more fully in the medication section of this document.

Urgent and Emergency Issues: All patients must have access to prompt treatment of hypo- and hyperglycemia. Hypoglycemia is defined as a blood sugar level $< 70 mg/dl$. Severe hypoglycemia is a medical emergency defined as hypoglycemia requiring the assistance of a third party and is often associated with mental status changes that may include confusion, incoherence, combativeness, somnolence, ~~the~~ lethargy, seizures, or coma. Individuals

With diabetes exhibiting signs and symptoms consistent with hypoglycemia, particularly altered mental status, agitation, and diaphoresis, should have their CBG levels checked immediately. Security staff who supervise patients at risk for hypoglycemia (ie. those on insulin...) should be educated in the emergency response protocol for recognition and treatment of hypoglycemia.

Medication: Correctional institutions should have systems in place to ensure that rapid-acting insulin analogs and oral agents are given immediately before meals if this is part of the patient's medical plan. It should be noted, however, that even modest delays in meal consumption with these agents can be associated with hypoglycemia. If consistent access to food within 10 min cannot be ensured, rapid-acting insulin analogs and oral agents are approved for administration during or immediately after meals. Should circumstances arise that delay patient access to regular meals following medication administration, policies and procedures must be implemented to ensure the patient recieves appropriate nutrition to prevent hypoglycemia.

Monitoring / Tests of Glycemia: Patients with type 1 diabetes are at risk for hypoglycemia and should have their CBG monitored three or more times daily... Unexplained hyperglycemia in a patient with type 1 diabetes may suggest impending DKA, and monitoring of ketones should therefore be performed.

Glycated hemoglobin (A1C) is a measure of long-term (2- to 3 month) glycemic control. Perform the A1C test quarterly in patients whose therapy has changed or isn't meeting glycemic goal.

Pg 38

Discrepancies between CBG monitoring results and A1C may indicate a hemoglobinopathy, hemolysis, or need evaluation of CBG monitoring technique and equipment or initiation of more frequent CBG monitoring to identify when glycemic excursions are occurring and which facet of the diabetes regimen is changing.

T) Nutritional Recommendations for Individuals with Diabetes; National Institutes of Health (4/22/22 was dated) this was viewed online and printed https://www.ncbi.nlm.nih.gov/books/NBK279012/#med-nutr-thrpy-diab. PUTTING_IT_ALL_TOGET.) Carbohydrate Counting... Carbohydrate counting is a tool that can be taught to motivated people with diabetes, so they can more easily estimate the amount (grams) of carbohydrates in a particular food. Furthermore, setting a target carbohydrate intake for each meal allows people with diabetes to more easily match their carbohydrate intake to the appropriate mealtime insulin dose. Potential advantages of carbohydrate counting include improved glucose control, flexibility in food choices, a better understanding of how much insulin to take, and simplification of meal planning.

Special Considerations for People With Diabetes Treated With Insulin Regimens:... Synchronize insulin with meal times based on action time of the insulin(s) used. People with diabetes should measure blood glucose levels prior to meals and snacks and at bedtime and adjust the insulin doses as needed based on intake... It is also important to educate the people with diabetes on adjustment of prandial insulin considering premeal glucose levels, carbohydrate intake, and anticipated physical activity.

Timing of Insulin and Meals : The greatest risk for hypoglycemia results when the peak insulin action does not coincide with the peak postprandial glucose. For example, the longer duration of action of regular insulin may lead to increased risk of late postprandial hypoglycemia, compared with rapid-acting insulin analogs, which peak closer to meal consumption. In addition, when the pre-meal insulin dose is too large for a particular meal relative to its carbohydrate content, hypoglycemia can result. ,. If meals and the insulin regimen remain constant, then no problems will usually result.

U) University of Florida Diabetes Institute (4/27/22 this was viewed, printed : https://diabetes.ufl.edu/outreach/resources/nutrition/type-1-diabetes/) :

If you have type 1 diabetes, it is important to know how many carbohydrates you eat at a meal. This information helps you determine how much insulin you should take with your meal to maintain blood sugar (glucose) control. Carbohydrates are the main type of food that raises blood sugar. ,. A delicate balance of carbohydrate intake, insulin, and physical activity is necessary for the best blood sugar control. ,. If the three factors are not in balance, you can have wide swings in blood sugar (glucose) levels.

Meal Planning : Be consistent. Meals and snacks should be eaten at the same time each day. Do not

~~Breakfast~~ Skip meals and snacks. Keep the amount and types of food (carbohydrates, fats, and proteins) consistent from day to day... Use insulin at the same time each day.

V) The Center For Diabetes and Endocrine Care by Jenna Fletcher; Reviewed by Katherine Marengo LDN, RD. (viewed/printed on 4/27/22; https://diabetesendocrinecare.com)

Researchers believe that beneficial snacks will contain: high levels of protein, healful fats, limited carbohydrates. Good snacks are those such as almonds, walnuts, peanuts, hard-boiled egg with a couple whole grain crackers, Low-fat cheese and whole wheat crackers; celery sticks with hummus, sliced apple and peanut butter,

W) Centers for Disease Control: Diabetes Meal Planning... A good meal plan will consider your goals, tastes, and lifestyles, as well as any medicines you're taking. A good meal plan will also include more nonstarchy vegetables, such as broccoli, spinach, and green beans. It will include fewer added sugars and refined grains, such as white bread, rice, and pasta ... and should focus on whole foods instead of highly processed foods as much as possible.

Counting Carbs: Keeping track of how many carbs you eat and setting a limit for each meal can help keep your blood sugar levels in your target range.

Carb Counting: How are carbs measured? ...

pg. 41

Carbs are measured in grams. On packaged foods, you can find total carb grams on the Nutrition Facts label. For diabetes meal planning, 1 carb serving is about 15 grams of carbs. This isn't always the same as what you think of as a serving of food. For example, most people would count a small baked potato as 1 serving. However, at about 30 grams of carbs, it counts as 2 carb servings. On average, people with diabetes should get half of their calories from carbs. That means if you normally eat about 1,800 calories a day to maintain a healthy weight, about 800 to 900 calories can come from carbs. At 4 calories per gram, that's 200-225 carb grams a day. Try to eat about the same amount of carbs at each meal to keep your blood sugar levels steady throughout the day.

When should I check my blood sugar? When you first wake up, before you eat or drink anything. Also, before each meal and two hours after a meal, and at bedtime.

What are blood sugar targets? Before a meal: 80 to 130 mg/dl. Two hours after the start of a meal: Less than 180 mg/dl... Blood sugar below 70 mg/dl is considered low.

pg. 42

X) Centurion Patient Education: What is Diabetic Retinopathy? Diabetic retinopathy is the leading cause of blindness in adults. What causes diabetic retinopathy? Diabetes is the cause of this eye disease. Over time, diabetes makes blood vessels weaken all over the body, including in the eyes. Poor blood sugar control can make retinopathy worse. What you can do: Have your eyes examined regularly. You can also help control your diabetes through exercise, diet, and medicine... These same steps may also help control diabetic retinopathy.

High and Low Blood Sugar (Hyperglycemia and Hypoglycemia): Hyperglycemia symptoms: Thirst, hunger, frequent urination, fatigue, nausea, blurred vision, headache, nervousness, confusion. Causes: Too much food, too little exercise, too little medicine, stress, illness, injury, short time between meals and snacks.

Hypoglycemia symptoms: Shakiness, sweaty, hunger, anxiety, nervousness, confusion, acting angry or irritable, slurred speech, headache. Causes: Too little food, too much medicine, more activity than usual, too long between meals or snacks, alcohol.

If you experience any of these symptoms, you should notify healthcare staff.

Steps To Manage Your Diabetes: Monitor your blood sugar. Keep a record of your blood sugar and work with your healthcare team to correct levels that are too high or too low.

Make Healthy Food Choices: Avoid skipping meals: Eat three small meals and snacks consistently and around

the same time each day. Try not to go longer than four to six hours without eating. Watch your portion size: Eating too much of any food can cause you to gain weight and lose control of your blood sugar. Avoid or really cut back on sugar drinks and foods. ... Special Diet: If you have a special diet ordered, stick to the special diet and try not to cheat. Healthcare staff will help you understand how to make better choices based on the food available to you.

Diabetes - Basic Information: Type 1 Diabetes is an autoimmune disease caused when your immune system attacks the cells in your pancreas that make insulin. People with Type 1 diabetes need to take insulin to replace what their body can no longer make... Without insulin, the sugar just stays in the blood. All humans need insulin to live.

How to Avoid Complications: The serious consequences of these complications are completely avoidable for most people with diabetes by managing blood glucose, blood pressure and cholesterol levels. You can manage diabetes by managing blood sugar.

Long-Term Complications of Diabetes: Diabetes can cause health problems over time. They are more likely to occur if your blood sugar is often too high. Over time high blood sugar can damage blood vessels in the body. It is important to keep your blood sugar in your target range. Complications of diabetes

include eye problems (retinopathy, glaucoma, cataracts), blindness, tooth and gum problems (periodontal disease), tooth loss; blood vessel (vascular) disease leading to circulation problems, heart attack, stroke, or a need for amputation of a limb, problems with sexual function, erectile dysfunction, kidney disease (nephropathy) that can lead to kidney failure, nerve problems (neuropathy) causing pain or loss of feeling in your feet and other parts of your body potentially leading to amputation of a limb, high blood pressure (hypertension) putting strain on your heart and blood vessels.; serious infections possibly leading to loss of toes, feet, or limbs.

Y)  Understanding A1C — American Diabetes Association :

| A1C | | estimated avg. glucose (e AG) |
|---|---|---|
| % | mg/dl | mmol/l |
| 6 | 126 | 7.0 |
| 6.5 | 140 | 7.8 |
| 7 | 154 | 8.6 |
| 7.5 | 169 | 9.4 |
| 8 | 183 | 10.1 |
| 8.5 | 197 | 10.9 |
| 9 | 212 | 11.8 |
| 9.5 | 226 | 12.6 |
| 10 | 240 | 13.4 |

Z)  Diabetes Health (www.DiabetesHealth.com) :
     More About Insulin :

| Insulin Type | Starts Working | Working the Hardest | How Long It Lasts |
|---|---|---|---|
| Rapid-Acting | | | |
| Apidra (Glulisine) | 5 to 15 min | 55 mins | 3 to 4 hrs |
| Humalog (Lispro) | 5 to 15 min | 20 mins to 1 ½ hrs | 3 to 4 hrs |
| Novolog (Aspart) | 10 to 20 min | 1 to 3 hrs | 3 to 5 hrs |
| Fast-Acting | | | |
| Regular | 30 to 45 min | 2 to 4 hrs | 5 to 6 hrs |
| Medium-Acting | | | |
| NPH | 1 to 1 ½ hrs | 6 to 10 hrs | 14 to 16 hrs |
| Long-Acting | | | |
| Lantus (Glargine) | 1 to 2 hrs | flat | 21 to 24 hrs |

The insulin Lantus and Levermir cannot be mixed with any other insulin. They must be given as a seperate shot. Lantus and Levermir should be taken at about the same time each day.

A2) Per https://www.straighthealthcare.com/insulin-chart.html :

| Semglee (Glargine) | 1 to 3 hrs | No Peak | 24 hrs |
|---|---|---|---|

B2) Centers for Disease Controls Do I Have Food Poisoning? :

Common symptoms of foodborne illness are nausea, vomitting, stomach cramps, and diarrhea. Symptoms can sometimes. be severe, and some foodborne illnesses can even be life threatening. Although anyone can get a foodborne illness, some people are more likely to develop one. Those groups include: Older adults, young children, People with immune systems weakened by medical conditions, such as diabetes ...

pg. 46

Why Keep Food Cold? Harmful bacteria multiply rapidly in the "danger zone" — the temperatures between 40 and 140 °F. So perishable food transported without an ice source won't stay safe for long...
Begin With Safe Food: Perishable food including meat, poultry, and eggs, must be kept cold at all times... Food should not be left out at room temperature more than 2 hours. Cold food must be kept at 40°F or below. Hot food must be kept hot at 140°F or above.

C2) KDOC — Aramark Contract: The original contract was begun on April 1, 1996. The latest addendum was signed on 2/24/2020 by Secretary of Corrections Jeff Zmuda, among others. At that time the contract was set to expire on June 30, 2022 but they extended it 10 years so now will expire June 30, 2032.

III. General Contract Terms: Performance Guarantee: Contractor shall file with the Director of Purchases a performance ~~surety~~ guaranty in the amount of 25% of the annual contract amount. The guaranty shall be returned to the Contractor on the completion of this contract subject to total or partial ~~forfeiture~~ forfeiture for failure to perform adequately the terms of this contract. If damages exceed the guarantee, ~~the~~ State may seek additional damages.

Inspection: The State reserves the right to reject, on arrival at destination, any items which do not conform with specifications of this Request.

Termination: The Director of Purchases may terminate this contract or any part of this contract, for cause under any one of the following circumstances:

    3.4.1. The Contractor fails to make delivery of goods or services as specified in this contract; or,

    3.4.2. The Contractor fails to perform any of the provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms.

The Director of Purchases shall provide Contractor with written notice of the conditions endangering performance. If the Contractor fails to remedy the conditions within ten (10) days from the receipt of the notice (or such longer period as the State may authorize in writing), the Director of Purchases shall issue the Contractor a written order to stop work immediately.

Termination for Convenience: The Director of Purchases may terminate performance of work under this contract in whole or in part whenever, for any reason, the Director of Purchases determines that the termination is in the best interest of the State of Kansas. In the event that the Director of Purchases elects to terminate this contract pursuant to this provision, it shall provide the Contractor written notice at least thirty (30) days prior to the termination date

09.45

Staff Qualifications: The Contractor shall warrant all persons assigned by it to the performance of this contract shall be employees of Contractor (or specified subcontractor) and shall be fully qualified to perform the work required. The Contractor shall include a similar provision in any contract with any subcontractor selected to perform work under this contract.

Failure of the Contractor to provide qualified staffing at the level required by the proposal specifications shall result in termination of this contract and/or damages.

Rights and Remedies: ... In the event Contractor fails to perform this contract on a short term basis and State must provide food service on an emergency basis, Contractor will reimburse State for all associated costs as liquidated damages.

In the event of termination, Contractor shall receive payment pro rated for that portion of the contract period services were provided to and/or goods were accepted by State subject to any offset by State for actual damages including loss of federal matching funds.

Reviews and Hearings: The Contractor agrees to advise the Director of Purchases, KDOC, and/or SRS off all complaints of recipients made known to Contractor and refer all appeals or fair hearing requests to the Director of Purchases, KDOC, and/or SRS. The State has the discretion to

pg. 49

require Contractor to participate in any review, appeal, fair hearing, or litigation involving issues related to this contract. Contractor staff shall provide information for response to grievances and testimony at disciplinary hearings, as required.

5.2 Services To Be Provided By Vendor/Contractor:

... Contractor shall be fully responsible for all food service equipment maintenance. ...

State does not anticipate employing additional security staff as a result of privatizing food service management. Therefore, Contractor will be expected to provide staff that will be able to work in a secure environment and supervise inmate workers. ...

... Only wholesome, appropriately inspected foods will be used. Foods outside of a normal stated shelf life date shall not be used.

Contractor shall be responsible for all food service area cleaning and sanitation, including food preparation and storage areas, dining areas, and kitchen dock areas, where such cleaning is currently supervised by food service staff, and shall assure compliance with all applicable federal, state, city and county health codes and requirements.

5.3 Services To Be Provided By The State: ...

State will provide administrative oversight to assure contract compliance, which will include on site field auditors as well as a central administrator. At least one of these staff members shall be a licensed dietician.

5.4 Program Specifications: Contractor shall ensure...
3.(f). Food at temperatures in accordance
with public health requirements...

5.5 Quality Assurance Performance Standards...

The Contractor should also provide an explanation
of how complaints will be handled in conjunction
with the KDOC grievance procedures...

Designated members of KDOC, contract staff, and
facility management will meet on a monthly basis
or as needed to evaluate the food service program,
identify problem areas and develop and implement
solutions...

Food portions to be served by Contractor will be
strictly observed and monitored by Contractor and
State...

All food temperatures will be carefully monitored by
Contractor through each meal period and recorded
to assure proper serving temperatures...

Contractor will effectively supervise inmates,
requiring a minimum amount of time on the part
of KDOC supervisory and management staff to
settle disputes regarding day to day issues...

Contractor will comply with all occupational health and
health standards and regulations as promulgated by
Federal, State and local authority. Any unsafe practices
observed by State will be corrected by Contractor
within 5 days of discovery. If this is

pg.51

not accomplished, State will have right to make corrections from payments due the Contractor. Failure to comply will be grounds for contract ~~term~~ termination...

5.7 Coordination of Efforts: The successful contractor shall work under close coordination with the Kansas Department of Corrections in completing any project assigned under this RFP.

12) KDOC - Centurion Contract: July 1, 2020 through June 30, 2022 (with the option to renew for (2) additional twenty-four (24) month periods)...

Termination for Cause: The Director of Purchases may terminate this contract, or any part of this contract, for cause under any one of the following circumstances: The Contractor fails to make delivery of goods or services as specified in this contract, the Contractor provides substandard quality or workmanship; the Contractor fails to perform any of the provisions of this contract; or the Contractor fails to make progress as to endanger performance of this contract in accordance with its terms

The Director of Purchases shall provide Contractor with written notice of the conditions endangering performance. If the Contractor fails to remedy the conditions within (10) ten days from the receipt of the notice,... the Director of Purchases shall issue the Contractor an

order to stop work immediately ...

Termination for Convenience: The Director of Purchases may terminate performance of work under this contract in whole or part, whenever, for any reason, the Director of Purchases shall determine that the termination is in the best interest of the State of Kansas ... In the event of termination, the Contractor shall receive payment prorated for that portion of the contract period services were provided to or goods were accepted by State subject to any offset by State for actual damages ...

Staff Qualifications ... Failure of the Contractor to provide qualified staffing at the level required by the contract specifications may result in termination of this contract ~~may~~ or damages ..

Materials and Workmanship: The Contractor shall perform all work and furnish all supplies and materials, machinery, equipment, facilities, and means, necessary to complete all the work required by this contract, within the time specified, in accordance with the provisions specified.

Industry Standards: If not otherwise provided, materials or work called for in this contract shall be furnished and performed in accordance with best established practice and standards recognized by the contracted industry and comply with all codes and regulations which shall apply.

Performance Guaranty/Bond: The Contractor shall file

with the Director of Purchases a performance guaranty/bond in the amount of $2,000,000.00. The guaranty shall be released upon the completion of this contract subject to total or partial forfeiture for failure to adequately perform the terms of this contract...

2.3.18 Nutrition and Medical Diets: The Contractor shall provide a daily list of all offenders requiring a special medical diet to the food service manager at each facility.

Pharmacy Services: Provision of all prescription and non-prescription medications shall be the responsibility of the Contractor... The Contractor shall fill and deliver all medically prescribed non-emergency medications within (24) hours from the date the prescription is written and shall provide such medications continuously thereafter as prescribed...

2.20.5 Health Care Documentation:... The health care record shall be kept current at all times. Documentation of every encounter with the offender is required to be completed on the same day in which the encounter occurred and in a timely manner as to provide accurate and consistent documentation of all health care occurrences ... Documentation of noting of HCP (Health Care Provider) orders shall occur as soon as medically necessary to provide appropriate follow up from the encounter. Noting of orders shall be accomplished by a licensed nurse and shall be completed within twenty-four (24) hours of the encounter...

2.22.4.4 In recognition of the sensitive nature of correctional facilities, Contractor agrees that in the event KDOC, in its discretion, is dissatisfied with

any of the personnel provided under this contract, KDOC may deny access of such personnel to the Correctional facility. KDOC shall provide written notice to the contractor of such fact and the reasons therein, and the Contractor shall remove the individual in question from the programs covered therein and cover with other appropriate personnel until an approved replacement is found.

2.20.7 Confidentiality of Offender Health Information

All health information shall be the property of KDOC... Offender health care information and offender institutional files are confidential in nature. The Contractor's employees and KDOC employees shall be allowed access to these files only as needed for their duties related to the care of the offender. and in accordance with the rules established by KDOC...

2.22 Staffing : The base staffing plan was provided in Appendix F... Copies of staffing schedules, encompassing all health care staff, shall be submitted. to the Director of Health Care Compliance by the 10th day of each month prior to delivery of service.

2.22.4.3 The Contractor shall furnish the necessary administrative, supervisory, professional, and support staff for the proper and effective operation of the program herein, subject to the approval of such staff by the Director of Health Care Compliance (which is a KDOC position).

Pg. 55

2.24 Staffing Deductions ... The Contractor shall provide, at a minimum, the staffing levels established by this contract ... The Contractor shall be required to backfill for all essential employees. Employees' positions classified as essential are: physicians, mid-level practitioners, registered nurses, licensed practical nurses, certified medical aides ... Essential hours may be backfilled by Overtime, PRN staff, or agency staff.

2.25 Clinical Performance Guarantees:
KDOC will monitor the health care services provided as outlined in this contract. Thirteen (13) specific measures shall be monitored each month in accordance with the minimum standard set forth in this contract. Those specific standards include: ... Special needs Clinics / Chronic Care / ... Specialty Services ...

2.25.2 If performance falls below 90%, the Contractor shall, pay to KDOC as fixed, agreed, and performance guarantees, $100.00 times the number of noncompliant Occurrences identified during the review period. ((This increases every 6 months of consecutive non-compliance by $25.00 (ie. $125 fine, $150 fine, etc. until the substandard performance is resolved)).

2.26 Compliance Deductions: KDOC may assess compliance deductions if it is determined that the Contractor is found to be non-compliant with any term of this contract not covered by sections 2.24 and 2.25 ... The amount of the compliance deductions shall increase after every 30 days that the item of

Non-compliance remains unresolved. The Director of Health Care Compliance shall provide written cure notice to the Contractor's Regional Vice President when it is determined that the Contractor is found to be in non-compliance.

E2) The Center For Diabetes & Endocrine Care (printed off internet on 4/27/22): "A high-protein, low-fat snack before bed (I also need this between Breakfast and lunch and lunch and dinner to sustain blood sugars) may help people with diabetes stabilize their blood sugar levels overnight." ... "Everyone's blood sugar levels change throughout the night. In people with type 1 diabetes or type 2 diabetes, these fluctuations can cause high blood sugar levels, or hyperglycemia, in the morning. A tactical late-night snack before bed may help balance these levels." ...

The Dawn Phenomenon occurs "between roughly 3am and 8am blood sugar levels surge as part of the processes of waking up. This causes high blood sugar levels in the morning.

The Somogyi effect occurs when, "glucose levels drop significantly between 2am and 3am. The body responds by releasing hormones that raise blood sugar levels again. It can release too much of these hormones, leading to high blood sugar levels in the morning. ..."

"Eating a bedtime snack can prevent blood glucose levels from dropping very low during the night and lessen the Somogyi effect." ...

"The American Diabetes Association recommend that people develop a personalized meal plan with

PG 158

their healthcare team, and this can include snacks and their timings." . . .

"Researchers believe that beneficial snacks will contain : high levels of protein, healful fats, limited carbohydrates. Foods with this composition may help limit blood glucose spikes during the night and ensure lower blood glucose levels in the morning." . . . "Fiber slows down the digestive process, releasing the energy from the food over a longer period. This may help keep blood sugar levels stable . . . whole wheat crackers add dietary fiber . . . Non-starchy vegetables are a great choice for a snack . . . and a good dose of fiber . . . for more protein add a low fat cheese (shelf stable for me since I have no access to refrigeration; per KDHE safe food practices to prevent food borne illness)."

"Peanut butter is rich in protein, fiber, and healful fats, an attractive nutritional profile for anyone looking to help control blood sugar levels."

All the above info was written in an article titled, "Which are the best bed-time snacks for people with diabetes?" by Jenna Fletcher and reviewed by Katherine Marengo LDN, RD (which means she's a licensed Dietician specializing in diabetic nutrition).

29:59

(1) Count 2 cont: Defendant KDOC SOC Designee Libby T. Keogh violated my 8th amendment rights of the U.S. Constitution

(2) Supporting Facts:

On SOC grievance appeal response dated 1/5/2021 CA-00022043 Libby Keogh replied to my grievance about snack sack request, request for 2800 menu, carb info so I can match carbs to insulin to control sugars, with Form 9's dated 9/23/2020, 10/2/2020 attached, 2 page handwritten letter detailing my concerns, Formal grievance w/ responses from UT Hoover that had AFSD Hay's reply and Warden Cline's response attached, and another 2 page letter I wrote on the appeal to SOC Jeff Zmuda asking for the "contact information for the KDOC Dietician. If they are contracted out so be it but I still need the information because Aramark's Julie Hay here @ EDCF told me that's who has the authority to change the 2800 calorie snack sack. I want it changed to 4 slices of white bread, 4oz peanut butter, and 2 juice packets. I explain why in the pages that follow... Please give me the information. To date nobody has answered my very simple questions."

I also explained my food safety concerns w/ not having shelf stable protein. Ms. Keogh responded, "... On appeal, the inmate offers no evidence or argument that suggests that the response rendered by staff at the facility is wrong... The response rendered to the inmate by staff at the facility is appropriate. The KDOC contracts Assisted Dining Solutions to provide the services of a dietician to review and approve

the tasks they have been contracted to perform may not be honored. Assisted Dining Solutions contact info: 322 S. 6th St. Griffin, GA 30224".

Ms. Keogh signed this response, CC'd Warden Cline and acknowledged "Image: SOCRESP w/ attachments". Marked as received in Warden's office via stamp as of "Jun 26 2021 Warden's Office".

On Appeal response to my grievance CA00022160 dated 3/23/21 SOC Designee Libby T. Keogh said, "... On appeal, the inmate offers no evidence or argument that suggests that the response rendered by staff at the facility is wrong ... The response rendered to the inmate by staff at the facility is appropriate ... Mr. Erwin is being provided with a copy of the special Diabetic/Calorie Controlled Diet he requested". This was a grievance RE the 2/10/21 incident where FSS Macdonald denied me bread in my snack sack which led to me being placed in segregation for a month as a result. What she attached was pgs 25-29 from the Aramark Medical Nutrition Therapy Manual detailing carb ranges for each diabetic diet.

On page 26 of the Aramark MNT Manual is a "Food List For Diabetes" that says, "One (1) Choice = One (1) Standard Portion" and then has a chart. The chart says, "Carbohydrates, starch: breads, cereals and grains, starchy vegetables, crackers, snacks and beans, peas and lentils", then says the carbohydrates in grams for all those items is, "15". For Fruits it says "15" for carbs, Milk "12",

"Sweets, Desserts, and Other Carbohydrates 15", "Proteins" none listed, "Fats" none listed, "Alcohol" "varies". They cite the source of this info in parantheses just above the chart as "(Revised 2014, American Diabetic Association and the American Dietetic Association)" but don't cite a document.

I have the full American Diabetes Association 2014 "Diabetic Care" document which also cites specific recommendations for diabetics in correctional settings. This chart in the Aramark MNT manual is nowhere in that document.

No explanation is given for what constitutes a "standard portion". From my 25+ years experience as a type 1 diabetic carbs vary widely in the Carbohydrates category they have in their chart. Just among cereals carbs can vary by 15 or 20 g per serving depending on brand of same exact cereal such as the bran flakes and corn flakes they serve me. That means the difference in insulin dosage can vary widely from 4-5 units affecting blood sugars from 31mg/dl ⇒ 40 mg/dl per unit of insulin. Even a one unit difference can be the difference between a low blood sugar or high blood sugar and an in range sugar. It's critical to be +/- 5 carbs max in accuracy.

What Libby Keogh gave me is not sufficient in any way to match carbs to insulin. I have no idea what one standard portion is, they offer no explanation even when I asked in subsequent grievances. I know the carbs in 1½ cups of prepared oatmeal unsweetened is 28g from the street because I ate it each day on the street for breakfast. So, certainly more than 15g carbs like this chart suggests. Their menu serves me 1 cup oatmeal. Using math that means the carbs in it is about 19g. Example: Their menu serves me 1½ cups branflakes, I have tried to assume 15g carbs for 1 cup based on what I know oatmeal is and what this chart says I should count for one portion. For dry branflakes I counted carbs as 28g but my sugars spiked time and time again. Clearly the chart was wrong. I have no idea how to use it and Aramark FSS's and KDOC staff refuse to explain how to use it so I can count carbs accurately and match to insulin. Centurion's doctors and nurse practitioner's also tell me they don't know even though on pg. 28 of the MNT manual It says "Note: Physicians, medical practioners and Insulin —

dependent diabetics can utilize the carbohydrate grams in order to calculate appropriate dosage and timing of medication.

On pg. 28 of the MNT Manual they give total carb ranges for my 2200 diet for each meal and snack sack. "Breakfast : 80-85g, Lunch 85-100g, dinner 85-100g, Snack 45-60g, Totals 295-345g".

That 15 carb range, as I explained before, isn't accurate enough in total plus it doesn't allow me to make choices on what I eat. I need the carbs in each item on the menu to choose less starchy carbs, calculate how many carbs I am eating, and then use that to match carbs to insulin. Accuracy is important. This chart is unusable. I need 20-25g carbs for each snack 3 times a day (60-75g per day total) with at least 4g protein shelf stable in each of those three snacks. This is so I can control blood sugars. As listed on pg. 28 of the MNT Manual the snack sack only has 45-60g. On pg. 27 of the MNT Manual it lists the contents of the snack sack as 2oz meat/meat alt., 2 slices bread, 1 serving of fruit. Meat Alt. is 2oz of Peanut butter, 2oz Turkey, or 2 hard cooked eggs.

In parentheses they say on that same page that "(Peanut Butter contains 6 grams of carbohydrate per 1 oz).

Also, it says on pg. 27 that "Snack Consideration: The 1800, 2200, 2500, and 2800 calorie diabetic patterns are based on 3 meals and an evening/PM snack. If the snack is not served, calories and carbohydrate distributions change".

Attached to my appeal to the SOC I sent 5 pages handwritten detailing I was denied bread in my snack sack by Ms. Macdonald w/ Aramark including dates, times, detailed account of events. I also mentioned EDCF Warden didn't do anything to help remedy my issues. I explained in detail why this was a severe threat to my health and safety. I asked for carb info on my diet, those responsible for denying me bread multiple times in my snack sack, I had asked for a copy of my 2800 menu, no response from the Dietician I had written over 2 months prior asking for the snack sack to be changed to get 4oz peanut butter instead of meat that puts me at risk for food poisoning, and reminded Ms. Keogh it was putting my health in serious jeopardy. Dated 3/16/2021 with my signature and KDOC #. I also attached ADA Nutritional Therapy documents including so my needs and IMPP 10-106D detailing Aramark violated KDOC rules and I explained exactly how they were violated.

On 4/22/21 I sent an appeal of grievance related to 11 food service incidents from 2/3/21 - 4/3/21 to the SOC's office in Topeka, KS. I attached a 2 page handwritten letter with all previous 15 pages documentation including Form 9's, grievances, KDOC policies, ADA facts about my medical needs regarding diet, Aramark diet documents that AFSD Hay had given me which were woefully inadequate, and handwritten accounts from me w/ details of people, places, times, dates, evidence descriptions, related to an ongoing serious threat to my health and safety as it related to my diabetes caused and perpetuated by AFSD Hay, FSS's KDOC officers, and Warden Butler @ EDCF. I described how it was harming me, my urgent need for their help, and my specific requests for remedy just as I had said in all previous stages of the grievance.

On 3/23/21 grievance CA 00022160 SOC Designee Libby Keogh attached this unnumbered grievance to the back of CA00022160 essentially meaning her response to the unnumbered grievance was the same for the seperate diet incidents on the CA00022160 grievance. The unnumbered grievance was the one with the 11 food service incidents dated 2/3/21 - 4/3/21 listed above. As with the CA000216 grievance Ms. Keogh said I offered no evidence suggesting the response from EDCF was wrong, the response EDCF gave me was correct, and still didn't address any of my serious medical problems causing me harm and endangering me.

① Count 3 confu: Defendant KDOC SOC Designee Darcie Holthaus violated my 8th amendment rights of the U.S. Constitution.

(2) Supporting Facts:

On SOC grievance appeal response dated 4/19/2021 CA00022223 Ms. Holthaus responded, "Findings of fact: The response provided to the inmate by staff at the facility is incorporated herein by reference and made part of this response. On appeal, the inmate offers no evidence or argument that suggests that the response rendered by staff at the facility is wrong. Conclusions Made: The response rendered to the inmate by staff at the facility is appropriate. Action taken: None Further. (Signed by Ms. Holthaus)

On 4/15/2021 I sent a 2 page handwritten letter on grievance CA00022222 in addition to all previous paperwork listed elsewhere in this complaint                                                    I covered

all the same points mentioned in the prior stages of this grievance along with the remedy of all involved responsible for not viewing the footage of Aramark not delivering bread to me or other cell houses as AFSD falsely claimed and refusing to hold anyone accountable even though this was a blatant attempt to ignore wrong doing by Aramark FSS's, EAI, M. Bos, Warden Butler, which permitted perpetuated an already toxic culture @ EDCF of deny, frustrate, and obstruct all my attempts to get relief for food service staff not following my medical diet which led to multiple medical codes being called to revive me and multiple disciplinary incidents
and prolonged pain and suffering due to the food service staff's mistakes causing me medical harm

This specific issue related to the video on 2/10/21 and the fact staff swept their mistakes under the rug denying me remedy

DO NOT WRITE BELOW THIS LINE

but I clearly mentioned the other medical issues, ... to me, seriousness of the situation, and asked the video that very well exists to be viewed to prove my claims. AFSD Huy and FSS MacDonald lied, did deny me bread, which led to me going to seg, denied me medical harm, and is part of an ongoing pattern of behaviour by both Aramark staff and EDCF Administration and Security officials of denying me a proper medical diet habitually over a year and counting at that point. Still on 4/19/21 SOC Designee Darcie Holthaus sent me a response to this grievance stating: "Findings of Fact: The response provided to the inmate by staff at the facility is incorporated herein by reference and made part of this response. On appeal, the inmate offers no evidence or argument that suggests that the response rendered by staff at the facility is wrong. Conclusions Made: The response rendered to the inmate by staff at the facility is appropriate. Action Taken: None Further." She didn't address my work order request to prove the cameras weren't functional or address that at all, she did nothing tangibly to even investigate this grievance. By her own admission she took no action when I brought to her attention serious, credible, allegations of my health and safety being put at severe risk and of staff possibly covering up their lies and wrongdoing, for which she took no action by her own admission.

On 10/14/21 I sent an appeal to SOC about grievance CA22406 prior to finally getting a response from

Warden Butler around about 10/12/21, more than a week after I sent my appeal. I followed the grievance procedure but of course none of the administrators filed including CMT Darcie Holthaus acting on behalf of the SOC Jeff Zmuda. She responded to my appeal I sent by stating, "October 12, 2021 RE: Invalid Grievance. I recieved your informal grievance. These issues are being/have been addressed and those complaints are Repetitive. KAR 44-15-102 (d) No offender shall abuse the grievance system by repeatedly filing the same complaint. For this reason, your repetitive grievance is being returned to you without substantive response." Marked as recieved by the warden's office Nov 16 2021.

(1) Count 4 : Defendant Warden Jeff Butler violated my 8th amendment rights of the U.S. Constitution.

(2) Supporting Facts :

On 3/16/2021 I recieved a grievance response from Warden Butler dated 3/11/2021 CA 22160 RE FSS Macdonald denying me bread in my snack sack on 2/10/21. He said, "... After a review of the applicable documentation, it was determined the response provided by J. Hay, Aramark is appropriate regarding your issues... Appropriate steps have been taken to ensure the process has been properly followed ...". I had attached 8 pages handwritten to the formal grievance to Warden Butler w/ Julie Hay's response written on the grievance that detailed my account of events w/ times, dates, places, people involved, KDOC IMPP 10-106D, ADA Nutritional Therapy docs, and described how denial of bread violated my medical diet, put me at severe risk of harm due to low blood sugar, Nurse Son explained to CO's Nedey and Lt. A.J. Johnson I was in danger from not having this bread and I needed it, and was still denied that bread. I advised no response to my 2/10/21 Form 9 from AFSD Hay, I requested a copy of the 2800 menu that AFSD Hay and KDOC Dietrcian continued to deny me, and requested Warden Butler to help me get that information and I included the Assisted Dining Solutions contact info. w/ CA-0002043 grievance number I got it from back on 1/5/21. On grievance response Warden Butler @ EDCF dated 4/12/2021

He responded on KDOC official letterhead, "Findings of Facts: Your grievance was recieved and a review into your allegations has been completed. Conclusion made: After a review of the applicable documentation, it was determined the response provided by CMII M. Bos is appropriate regarding your issues. Action taken: Appropriate steps have been taken to ensure the process has been properly followed."

M. Bos' response was also on KDOC official letterhead dated 3/31/2021. She said, "Findings of Facts: Your grievance was forwarded to me regarding your request to change the 2800 calorie diet. Conclusions made: The menus that are utilized for the State of Kansas must go through a review and approval process to assure they meet the criteria for each type of diet. The final menus are signed off by the Aramark Dieticians, KDOC dietician and the State contract monitor. You indicated that you sent a letter to the individual Aramark suggested you contac I understand it has been two months according to you since you sent the letter. Please be patient and await their response to your correspondence. Thank you for taking the initiative to write to them regarding changes to the snack sacks. I printed off the menus and attached them to this grievance. Action taken: Nothing Further (Signed M. Bos Classification Administrator)."

The menus she attached were the regular and vegetarian menus <u>not</u> the Diabetic menu.

Attached to my original Form 9 dated 3/12/21 I sent a 2 page handwritten letter detailing my specific requested snacksack changes of 4oz PB, 4 slices white bread, 2 juice packets instead of sliced meat, breadroll, 2 oranges, I explained why in detail including

details about risks of food poisoning due to giving us perishable meat w/o us have a way to keep it at safe temps, why I medically need usable protein and sufficient carbs for snacks as a type 1 diabetic per Americans with Diabetes Association and asked for help contacting whoever has decision making authority on changing this snack sack, getting me the nutritional info so I can match carbs to insulin to control sugars, and the fact I need a 2800 menu so I know portions, foods, so I can dose insulin and plan what to eat to control sugars.
I also said I had written the Assisted Dining Solutions people per the State Purchaser Director and State Contract Monitor for Aramark's contract Randy Singeltary but after 2 months hadn't recieved a response or the info. This letter also went up to M. Bos and Warden Butler.
On 4/3/21 I sent a formal grievance to UTS Buchanan in AI when I was @ EDCF regarding 11 different issues with my 2800 diet tray and snack sack for my diabetes. These issues occurred between 2/3/21 and 4/3/21. Aramark FSS's including AFSD Julie Hay continually and deliberately gave me wrong items putting my health at risk, refused to replace missing items which threatened my health significantly, refused my reasonable accommodation to my snacks, refused me a 2800 menu, refused me the carb info on the menu so I could match carbs to insulin, and I had recieved no response from the dietician on these issues whom I had contacted 2 months prior at that point. I detailed this in a 4 page letter attached to my grievance w/ 14 pages of Form 9's, handwritten details, official Aramark documents related to my diet, and cited Americans With Diabetes info relevant to justifying my medically justified requests/complaints along with KDOC policy documents verifying Aramark staff was

very much in the wrong. I let Warden Butler know that I was in danger, actively be harmed by NOT having my issues w/ my diet resolved in the ways I medically needed, and I explained it was putting me at severe risk of short and long term complications with diabetes Including risks of seizures, comas, and death. The documents attached detailed times, dates, people, places, and very specific details of each of the 11 separate incidents.

On 4/16/21 Warden Butler typed a letter which stated, " "I have recieved your grievance dated 3/27/21" (referring to the date of the last Form 9 I sent out of the 11 incidents and listed it as date on the formal grievance to UTS Buchanan on 4/3/21 when I sent it to her). "After reviewing this grievance, it is determined this is a duplicate issue which has been addressed. As stated in KAR 44-15-102 (G)(C)(1): ....." which he described process for appealing to the SOC Jeff Zmuda. He was wrong since the issue hadn't been addressed, resolved in any way, and new incidents were ongoing everyday but he still took no action.

On 4/2/21 I forwarded to Warden Butler my grievance w/ Form 9 attached dated 3/2/21 about EAI not preserving the video at my request that would have proven I was denied bread in my diabetic snack sack on 2/10/21 @ dinner by Aramark FSS Macdonald leading to severe risk of a low blood sugar and disciplinary segregation for me on basis of alleged threats that were supposedly made by me towards FSS Macdonald which was a lie as proven by the Disciplinary Office later on which led to me being released from segregation on 3/17/21 and being placed that same day back to work in the kitchen

on Ms. Macdonald's shift. To that, I wrote a 2 page letter and all previously mentioned paperwork. In that letter I said, "First, I requested video not only from A2 CH but for all cell houses as well. EAI did not address my request properly at all. M. Bos was mistaken by stating I only requested video from A2 CH. M. Bos was also mistaken in stating I made threatening comments on 2/10/21. That was found to be false by disciplinary. Those comments that were disrespectful came after both Aramark's Ms. Macdonald and KDOC officers Neeley and Lt A.S. Johnson refused to provide me bread for my medical diet and I ran the risk of low blood sugar as a result. The fact Bos claims that video is not available is not believable. I cannot imagine that video in a maximum security prison is not available for a 5 hour period that I requested on 2/10/21. If in fact this is the case a work order would have been put in to repair the cameras. Does one exist? What about the camera footage I clearly asked for from the other cell houses? A2 is a segregation unit, has many cameras, and I am to believe all the cameras were down? I don't believe that at all. I made my request in a timely manner and I would like my request to be fullfilled. There should be video of Aramark putting together bread for the 2800 shack sacks in the kitchen, outside the T37 entry/exit door, at the guard station on the side of the compound where gen pop and seg cell houses

are located, and video from ACH house as well as DCH, ECH, CCH, and BCH. There should be video of them bringing it to my cell in A2 267 as well. I believe they are lying and in fact I was discriminated against and retaliated against. Please look into this more carefully".

On a grievance response dated 4/12/21 on KDOC EDCF letterhead grievance # CA 22222 Warden Jeff Butler Said, "Findings of fact: Your grievance was recieved and a review into your allegations has been completed. Conclusions made: After a review of the applicable documentation, it was determined the response provided by CMII M. Bos is appropriate regarding your issues. Action Taken: Appropriate Steps have been taken to ensure the process has been properly followed."

He refused to address any of my serious concerns, didn't do anything but look at the grievance per his own admission above. I made very serious, credible, allegations w/ specific details that could be easily verified/refuted with even a cursory attempt to investigate my claims but he chose not to. He just gave me a formulaic response, per usual, and didn't resolve the many issues I had been having w/ Aramark he was aware of per many grievances I filed that detailed the severe risk/harm it was doing to me and still didn't lift a finger to investigate. Never addressed the camera issues at all.

(1) Count 5 : Defendant Captain Dale K. Call violated my 8th amendment rights of the U.S. Constitution.

(2) Supporting Facts:

On 9/14/2020 Form 9 to "Warden" @ EDCF was answered by Warden Designee Captain Dale Call. This was an Emergency Grievance and I indicated this on top center of Form 9 w/ the KAR 44-15-106 that lays out such procedure. I said, "Due to Corona meals and my medications are being significantly delayed and causing me serious medical problems. I am type 1 diabetic. For the last 2 days there has been an 11-12 hour gap in between me getting my breakfast insulin and lunch insulin. I am currently taking NPH for my basal insulin. So my blood sugars are shooting up because there is this delay @ lunch... These delays also put me at risk for lows later in the day because delaying my insulin @ lunch and dinner shifts the insulin cycles and can cause the two insulins I take to peak at the same time and drop me out..."

Captain Call replied, "... Due to the current disruptions in food service meal deliveries in the units has caused medical concern but they are meeting your needs..."

He is not a doctor. He's in no position to determine my needs medically. Medical Science clearly says my needs are not being met w/ these serious delays and confirm the risks to my health under such conditions due to poor timing of meals/insulin is a direct and urgent threat to my health/safety which he deliberately ignored

(1) Count 6 : Defendant UTS Brian Reeves KDOC @ EDCF Violated my 8th Amendment rights of the U.S. Constitution.

(2) Supporting Facts :

On 9/21/2021 UTS Reeves responded via typed letter on KDOC letterhead to my grievance #A22406. I had sent to him about my various diet issues with Aramark staff not giving me my proper medical diet, not giving me a medically sufficient snack such as at dinner, its causing me severe medical problems and risk of severe medical problems, both CO's and Aramark staff are not correcting issues w/ meals when they occur and on the occasion they do it takes hours and I suffer low blood sugars and have to argue w/ CO's to get food to bring up lows and the CO's refuse my requests for nurse to give me Arrowchedi / medical assistance. As resolution, I asked for, among other things, "my proper diet w/o exception. There is no excuse to give me anything other than my medically prescribed diet. It is critical for me to control blood sugars, prevent short term and long term risks of injury to myself, and to prevent increased risk of stroke, heart attack, and death. Nursing's own Diabetic education documents they gave me confirm this. I can't stress enough how important this is. I am in the hole because staff refuse to give me what I got coming in terms of my diabetic care. These diet issues are just one component of that. I am very, very, very frustrated. I need this addressed

properly, completely and urgently. I have been way too patient and need staff to have a sense of urgency. I want my proper 2800 diet tray w/ snack sack at every meal. Breakfast: diet hot cereal or bran flakes, either diet eggs, sausage, peanut butter, 3 slices of bread never bread roll. Lunch: main course — non mixed dish, 4oz meat, 8oz vegetables, (1) slice of bread never bread roll, milk, and fruit. Dinner: main course — non mixed dish, 4oz meat, 8oz vegetables, 2 slices of bread never bread roll, fruit. Plus snack sack: fruit, 2oz bread (sliced), 2oz meat or peanut butter. On the snack sack it is not medically sufficient and have asked many times for it to be changed to 4 slices of bread, too shelf stable protein from at least 3 different sources (i.e. peanut butter, shelf stable cheeses, high protein bars or soy proteins that are shelf stable, and (2) juice packets instead of fruit. Unfortunately, this has been ignored all the way up to the Secretary's Office many times and KDOC's dietician has refused to even respond to my request... So, again, please make sure Aramark and KDOC officers ensure I get a proper 2800 tray every meal and get a proper snack sack at dinner too. Again I am also asking my request for reasonable accommodation for the snack sack I get

at dinner be implemented asap. Currently, that snack sack is awful for controlling blood sugars as nursing can verify..."

On the 9/21/2021 letter from UTS Reeves he said, "Conclusions Made: 1). The following testimony has been provided during this investigation: a) On 9/16/21 CSI Gadberry K0000 225X92 (the assigned 1800 hrs—0600hrs) stated that during the times that he has worked inside B-CH there has only been 1 time when resident Erwin's 2000 diet did not arrive complete to B-CH, there has not been a single instance where Resident Erwin brought concerns or issues regarding the meals Aramark provides. b) On 9/16/21 COI Taylor K0000 233719 (an assigned to B-CH 0600hrs—1800hrs) stated that since Resident Taylor has come to B-CH his tray has had a deficiency approximately once a week, where Resident Erwin brings to Officer's attention that his meal has a deficiency. Every time Resident Erwin is offered to have his tray sent back then have the kitchen contacted in order to get the correct tray, or take in have items from excess trays take the place of missing or deficient items. He has always turned down having the correct one delivered in exchange for items from excess trays..." 2) The following conclusions have

been reached." a) It is substantiated that Aramark has occasional deficiencies with the diet meal trays they provide, however these occurrences are addressed by staff upon notification. b) It is unfounded that security staff have not taken any steps to correct 2800 diet meal trays deficiencies due to the testimony of 2 officers, which validate each other's but contradict Resident Erwin's statements. c) It is unsubstantiated that Resident Erwin fears that deficiencies in the food trays provided him for his 2800 diet will lead to grievous health results for himself due to his diabetes. The reason for it being unsubstantiated is the testimony from both officers, where in Resident Erwin does not accept the offer for a correct 2800 diet meal tray, but instead accepts the offer which included non 2800 diet food items from excess trays. "Action Taken: Aramark has been alerted to discrepancies with their meal trays and have been in discussion with EDCF staff regarding solutions."

It should be noted on the Formal grievance to sent to I/TS Reeves on 9/11/21 which he was responding to Is said, "9/11 Aramark forgot my 2800 tray per C51 Cadbury. Cadbury refused to get Aramark to fix it and instead gave me

a regular tray w/ cheesy grits, eggs mixed with gravy, and coffee cake. A 2800 is supposed to get dir't grits, dir't eggs w/o gravy, and 3 slices of bread. Of course I did not eat that because my blood sugar would have been dangerously high. I just ate the grits and eggs. This is outrageous. (see attached)"

In addition, on my letter to Warden Butler dated 9/22/21 I said: "Yet again UTS Reaves' hostility and indifference towards me and my issues w/ a whole host of things related to my diet rears its ugly head again. Reaves claims it is unfounded that security staff..." I responded to Warden Butler to Reaves' statement by saying, "Well, that's absurd to say the least. I have appealed diet issues many times, including officers' continued lack of due diligence with verifying the meal carts before they leave the kitchen as with both KDOC staff and Aramark AFSD Julie Hay have confirmed is the proper process in previous grievances. CS1 Goldberry, who is the UTS (→

7

knows this is his responsibility, yet apparently
sees no harm in continuing not to do it.
If he says he does then he is derelict
in his duty, because my trays keep
getting messed up, Cadberry's and Tayler's
testimony, according to Reeves, at least
minimally validates this because they
are claiming I refuse to have a correct
tray brought which means they didn't
do their job and verify the cart while
it was still in the kitchen.

It is true I no longer, although I have
many times in the past including the
date in question in this grievance,
have CO's get Aramark to correct the tray.
The reason is because of the risk of low
blood sugar. By the time I get my tray
often, but not always, 1 hour or more has
passed since getting my insulin. I must
have food within 15 minutes (technically)
of my insulin. I can hold out for 30 minutes
but past that it gets very dangerous.

I have ample proof of myself being harmed

from low blood sugars in fact these types of situations. I can provide it if you like but would make this grievance longer. UT's Ruuves has in the recent past threatened me with disciplinary action for providing too much evidence so I will now only do so upon request in writing.

I shouldn't have to beg for my correct tray. Aramark should provide it because it is my medical diet. KDOC should verify it is correct in the kitchen so I don't have an issue. 3y, 40, 6d, 90 prediabetes after insulin and be put in a position where I have to either accept a wrong tray or no tray for lord knows how long until Aramark corrects it. I have proof of them not doing so, Officers even admitting on record of this, and multiple disciplinary actions against me because of it including on 7/4/21 with case # 21-07-007.

the world to chat, type of way,
Certainly he could have walked down
the stairs 20 feet to my cell and
talked with me about these issues
before writing his response, but he didn't.

Had he done so he would know why I
don't risk myself by waiting for
a absurd amount of time to
get a proper tray, which shouldn't
have been wrong in the first place.

You as the Warden, or Warden's designee,
can research this yourself, talk to
me in person for a few minutes,
or I can prove it to you in court,
the choice is yours.

My point is, the risk to my health
in the short and long term is real.
I have exhaustively explained this
before to Reeves, and many others,
including you Warden Butler, I take
considerable offense to Reeves
accusations I don't care. I do!

Form 9 dated 10/27/2020 to "Aramark - Julie Hay, I said,
"Something needs to please be done about the inconsistencies
with meal service. I'll give Monday, October 26, 2020 as an
example. Got breakfast carts at about 11am, lunch at 11am,
and dinner at 6pm, I am type 1 diabetic. My insulin
can't be given to me until trays are physically to the pod
per nursing. So when meals are early, late, so forth my
insulin gets messed up. →" (continued from there)
AFSD Hay replied, "We have to stay on a consistent schedule.
Form 9 dated 12/8/2020 to "Aramark, Kitchen Sittin' Weaver"
I said, "Myself and others were not given our diet sacks
at dinner on 12/8/2020 about 5pm. I asked CO Walling
about it and he said the kitchen was gonna bring them
down when they still hadn't the CO called again and
they said they were "working on it", I am type 1
diabetic and need that snack sack to maintain healthy
blood sugars. Not recieving it violates IMPP 10-106D.
There is no cause for to not recieving our medically
approved modified diet sacks. This needs to be fixed
so it never happens again."
AFSD Hay replied, "Will check into this" and signed
her name "Julie Hay".
Form 9 dated 1/15/21 to "Aramark - Julie Hay" I said,
"Whoever did diet sacks for dinner today messed up. I
am on 2800 diet. For lunch regular menu was served
grilled bologna and cheese but 2800 was given a
hamburger patty which is fine. What isn't fine

is the fact were given leftover grilled bologna and cheese sandwiches for our 2800 diet sacks @ dinner. That is very perishable and robbed me of bread and protein for 24 hrs because that sandwich can't be kept for more than 2 hrs w/o refrigeration. I have complained for over a year about this bad stuff like that keeps happening. Can you please ensure diet sacks are made right, I wasn't allowed grilled cheese at lunch so I don't know how it can be given in my diet sacks. That's crazy."

AFSD Hay replied, "Will look into this".

Form 9 dated 1/18/21 to "Aramark Julie Hay" I said, "Aramark supervisor Garcia denied me a proper 2800 calorie diet tray today at breakfast. It was grits, peanut butter, milk, and should have been 3 slices of white bread for 2800 but he gave me the regular tray that had a dinner roll. The dinner roll wasn't even 2 oz like it is supposed to be so I get robbed of 19 carbs. This is unacceptable. A supervisor should know better, especially Garcia. Please educate him on this. He kept trying to tell me regular tray and the 2800 was the same thing but it is not."

AFSD Hay replied, "Breakfast is often the same tray, I will let him read this."

Form 9 dated 2/3/21 to "Aramark - Ms Hay" I said, "Hello, I have noticed whoever is doing the snack sacks for the 2800 calorie diet has periodically been forgetting to put bread rolls in our sacks. This has happened several times in the last

2 weeks and happened again today. Can you please remind the person prepping those sacks that we get bread rolls in our diet sacks? Thank you for your help". It should be noted I said bread rolls because at this time I hadn't recieved a diabetic menu, nor the ACS MNT Manual, so I was unaware the dietician for ACS had in fact listed sliced bread for our snack sack. I had repeatedly asked for sliced bread up to this point as a reasonable accomodation to the snack sack but per AFSD Hay had been told bread rolls were what our diet is supposed to get, which was a lie. In response to the 2/3/21 Form 9 above AFSD Hay said, " Will look into this".

Form 9 dated 2/25/21 to "Aramark — Ms. Hay" I said, " May I have a copy of the "Snack diet sheet" that shows what diabetics get in their snack sack at dinner? I need it as soon as possible because I need to prove to the disciplinary hearing administrator I was supposed to recieve bread in the snack sack since I am Type 1 diabetic. Thanks."

AFSD Hay replied, " Attached — hope this helps you with some of the issues you have been dealing with. "

Form 9 dated 4/21/21 to "AFSD Ms. Hay Aramark — say

"(In regards to you responding on another grievance the menu I attached wasn't the one you gave me) Well, what menu did you give me Ms. Hay? If you have a 2800 calorie menu I would love to have it. The KDOC contracted dietician still hasn't given me one or even responded to my request for one. So, if you have one I would appreciate a copy please. I've been trying to get one for a year now. Thank you."

AFSD Hay replied, "attached" and a 105 pages of meal sheets (one for each of 3 meals per day for a 5 week period) were attached.

Form 9 dated 4/16/2021 to "Unit team Horsch" that UT Horsch crossed his name out then wrote "Aramark" above and forwarded to them I said, "Today at lunch Ms Macdonald was Aramark Supervisor at window. An unknown inmate was handing out trays. I believe he was a white man possibly in his 30's. The inmate handed me a regular tray with a milk and orange after I showed my ID and asked for a 2800. I said "I need a 2800" again. He insisted that was a 2800. I said no, not supposed to have ~~blueberry muffin, not supposed to have Turkey~~ Tetrazzini." We (2800 diabetics) get turkey slice, plain noodles, and not supposed to have the cake. He kept arguing, took the cake off then handed me

the tray w/o fixing the rest. Ms MacDonald didn't do anything to fix it." I attached the improved diet menu AFSD Hay had given me in October of 2021 as proof of what we were supposed to get.

AFSD Hay replied, "This menu is not the one I gave you."

Form 9 dated 6/28/21 to "Unit Team" that was forwarded to Aramark by UTS Reeves I said, "I am not sure who exactly is to blame but I think it's a little bit of both. Between the officers in this pod and Aramark I am not getting my correct 2800 diet w/ snack sack. Saturday's dinner I got tortilla chips and no bread, I should have got 2 slices of bread on my dinner tray and no tortilla chips. Sunday's lunch I didn't get my 1 slice of bread. Sunday dinner I got 2 pieces of cornbread instead of 2 slices of bread. Monday's dinner they gave me cake on the tray then gave me a hp sack instead of the 2800 sack (shorting me 2 pieces of fruit), The officers gave me 2 extra oranges they had so they made it work but that's ridiculous. What I am supposed to get on my tray is on the "diet meal plan" sheet for each meal. There are 105 of them (each meal of 5 week menu) I have a copy of that. I know what I am supposed to get and so do they, I also have a copy of the "snack diet sheet" which shows what I get on my snack sack and so do they.

If officers are verifying the trays like they are
supposed to even if Aramark screws up they should
catch it. My goes is the officers aren't doing.
My 2800 tray is in the meal cart always and
they aren't making sure my 2800 snack sack is
in there too. Aramark isn't supervising inmate
staff and ensuring they put the correct stuff
on the meal tray itself. Please work w/ the
officers and Aramark to fix this asap. Thanks."
AFSD replied, "The trays for the 2800 meals are
being sent out as required — 2 protein, 2 vegetable,
4 starch, bread, fruit, milk —".
Form 9 dated 7/11/2021 to "Unit Team" (UTS Brian Reeves)
I complained about getting frosted flakes instead
of bran cereal causing my sugar to spike to 410 mg/dl
I had to because it was the only thing I got to
eat @ breakfast except for eggs and milk and juice
I detailed this on Count _____ for Defendant UTS
Brian Reeves. Also several other diet issues too.
Form 9 dated 7/15/2021 to "Unit Team" (UTS Brian
Reeves) I complained of spoiled turkey in diet sacks.
This is detailed on Count _____ for Defendant
UTS Brian Reeves, Reeves response indicated Aramark
was made aware.

Form 9 dated 6/28/21 to "Unit team" (UTS Brian Reeves) was sent by UTS Reeves to Aramark + He crossed out "Unit Team" and wrote "Aramark" above it. He saw both my complaint and APSD they's response because both times it passed through his office per policy and procedure.

Form 9 dated 7/1/2021 sent to "Unit Team" (UTS Brian Reeves) I said, "At lunch today Aramark didn't give me a slice of bread on my 2400 tray. I immediately told Cod Flores and SGT Stephenson. They said they'd get it. At 12:05pm at tray pick up I asked Flores if they (Aramark) was bringing my bread. She said, "yes". At 12:32p. Aramark Supervisor and inmates came to get carts, Aramark Supervisor stood there at the gate, Neither he nor Inmates brought me the bread. This is unacceptable! I take insulin based on the menu. When they short me I have to dig into my snacksack which is already insufficient. In order to not drop out I have to save parts of my meals, which is against the rules. What Aramark is doing is wrong, puts me at risk for a low blood sugar which I take rather personally, and violates IMPP 12-106D, violates the Aramark-KDOC Contract, violates my 8th amendment rights under the U.S. Constitution, and is discrimination for being diabetic which violates ADA Title II. No other diet is being shorted bread or any other item and having their health put at risk. This is also retaliation for me filing grievances.

I want Aramark Sodexo Supervisors held accountable and I want this nonsense to stop.

Form 9 dated 7/11/21 to "Unit Team" (UTS Brian Reeves) I complained, "At breakfast today I was given Frosted Flakes instead of bran cereal like it says on the 1800 menu. As a result my blood sugar at lunch was 410mg/dl! It was all I had to eat so I had to eat it. Since Aramark still refuses to tell us how many carbs are in the food and IDOC's dietetian has also refused too, I can't do the "guesstimate of what I'm eat to control this" you call easily because how much insulin to take because we match carbs to insulin. I don't have the tools I need to manage sugars and Aramark keeps giving me the wrong foods on my tray. At lunch today I was given a hot dog bun (homemade) of unknown size instead of a slice of white bread. White bread that is sliced is consistently 13 carbs per slice. Homemade bread is not consistent and I got no idea how many carbs were in that homemade hot dog bun. Aramark still doesn't give us sliced bread at dinner either (2 slices). They keep giving us dinner rolls that are homemade and I don't know the carb information. Please make them follow the menu strictly and I need the carb info. AFSD Hoy replied, "Let me look into this." She replied because UTS Reeves crossed out "Unit Team" and wrote "Aramark" on Form 9 then sent it to her. He handed it back to me so I knew about it.

[text illegible] ... (___ B___ Reeves) I complained, "Aramark served me, and according to Officer Crawcell ___ ___ the other inmate, ___ ___ family in ___ ___ ___ ___ ___ on 7/18/21. I ___ Crawcell and told him ___ how rotten that was. The ___ ___ ___ ___ ___ didn't even have to put it ___ ___ ___ ___, The meat was ___ . ___ ___ ___ ___ ___ ___ roll w/14 ___ ___ ___ ___ ___ I ___ ___ ___ of ___ ___ ___ ___ ___ ___ give me an xtra tray to make up for it but what's crazy. That violates IMPP 10-106D ___ ___ ___ Doc ___ Aramark ___ ___ ___ FSD ___ ___ had ___ ___ ___ ___, ___ ___ ___ ___ is who ___ ___ ___ ___ ___ ___ ___ ___.

Ofc ___ replied, "the issue is being ___ on ___ ___ ___."

On 7/8/21 Form 9 "Emergency Grievance" to "Warden Butler" at EDCF I said, "Tonight at dinner Aramark refused to bring me my 2800 tray even after repeated attempts by Officer Owens to get them to bring it down. They were going to try to make me wait until meal carts got picked up between 7pm and 8pm. I am Type 1 diabetic on 2800 tray w/ snack sack. Already had taken insulin. I would have dropped out if Owens hadn't brought me a regular tray. Aramark never did bring me a 2800 tray. They have done this repeatedly !!! I am tired of my

health and safety being jeopardized because of laziness, incompetence, and or indifference (take your pick) on the part of Aramark especially but also KDOC Officers, Unit Team, administration, Centurion, on a whole host of issues related to my diabetes. I have grieved these over and over for 1.5 years+!! Issues w/ my diet, Snack sacks, insulin, and getting out on time for insulin (when I was in gen pop) are still unresolved! I have been in 2 violent encounters w/ KDOC Officers in the last 14 days because I was denied insulin by Nurse Myers on 6/24/21 @ Breakfast for no good reason and was denied my snack sack by Aramark and KDOC Officers on 7/4/21 at dinner. UTM Hoepner told me on 7/6/21 things will be different in BCH but it's not at all!! The Same nonsense keeps happening, my health is in constant danger, and nobody seems to give a damn. I need to speak to you personally to get this fixed. Cuff me up, arms, and legs. but I need to speak to you ASAP!!"

UTS Brian Reeves replied, "Improper Format did not follow grievance process". He signed it. This despite the fact I followed the process for an emergency grievance to a T.

(1) Count 7 : Defendant Aramark Assistant Food Service Director Julie Hay violated my 8th amendment rights of the U.S. Constitution.

(2) Supporting Facts :

On 10/10/2020 Form 9 to UTS Holland B2 @ EDCF I asked for the contact info for 'State dietician' per instructions I recieved from AFSD Julie Hay, UTS Holland said they don't have it by saying, "I do not have this information, please ask Aramark if they can provide that for you".

On 10/5/2020 Form 9 to 'Staff Dietician (not Aramark)' while I was in B2-203 @ EDCF I requested a change to the snack sack for my "2800 calorie diet so the snack sack better enables us diabetics to manage blood sugars. Specifically, I want the snack sack to be (4) slices white bread, 4oz peanut butter, and (2) juice packets". Inadvertently this was sent by UTS Holland to AFSD Julie Hay. She responded, "Send your request to the State Dietician".

On 10/5/2020 Form 9 to 'Staff Dietician (not Aramark)' I asked for the, "... nutritional information for the 2800 calorie diet please. Specifically, I need to know the calories, carbohydrates, sodium, fat, and protein amounts per serving for each item on the menu, I especially need to know the carbohydrates per serving because I am Type 1 diabetic and use that information to determine how much insulin I need for meals." AFSD Hay responded, "I can't find this info on our Aramark info. Please send your request to Topeka to the state dietician".

On 10/2/2020 Form 9 to 'Aramark — Julie Hay' I asked, "I am type 1 diabetic, I need to know the nutritional information for the 2800 calorie menu including calories, carbohydrates, ... I really need the carbohydrate information because I use it to determine how much insulin I need..

AFSD Hay responded, "I couldn't find the nutritional info you are requesting, you may have to get the dietrician info from your UT, Form 9 the State dietrician for your answer..."

On 9/23/2020 Form 9 to "Aramark-Julie Hay" I was responding to a previous Form 9 reply AFSD Hay gave me regarding my snack sack accomodation request and I said, "You replied by saying you are following the menu guidelines, which I understand. I want to request a change to the menu guidelines so the snack sack better enables Diabetics like myself to manage blood sugars. So can you forward this request to the dietrician or person(s) who can make decision on changing these menu guidelines?", She replied, "You would have to send any inquires about this, yourself, to the State dietrician."

On 9/22/2020 Form 9 to "Unit Team" saying, "I need to send a request to the dietricians that approves changes to, and guidelines for, the menus, including the special diets and snack packs for the 2800 calorie diet. Can you tell me who that person is, whether I can send them a Form 9, and if not can you tell me how I can contact them please?". UTs Holland replied, "Write a Form 9 to Aramark and they can direct it where it needs to go." Dated 9/23/2020.

On 9/16/2020 to "Aramark - Kitchen Sup. Jules (spelling?)" I asked, "For the snack sack on the 2800 calorie diet I have a request. Instead of bread rolls can those be replaced with sliced white bread? Instead of bread rolls can those be replaced with sliced white bread? Instead of sliced

Meat, which is perishable, can that be replaced with peanut butter? So my request is that the snack sack be changed to include (4) slices of white bread, 4oz peanut butter, and either (2) oranges or (2) juice packets w/ vitamin C. (See attached) → ". This is when I was in B2-203 @ EDCF. AFSD Hay replied, "We are following the menu guidelines".

On 12/16/2020. Formal Grievance to UT Hoover I requested changes to the snack sack for the 2800 diabetic diet, copy of the 2800 menu w/ portion sizes, carb info so I can match carbs to insulin and make good choices on what to eat. I attached Form 9's from UTS Holland and AFSD Hay dated 9/23/2020 and 10/2/2020 w/ a 2 page letter I wrote and attached to those Form 9's detailing I need shelf stable protein for food safety reasons, sliced bread instead of bread rolls because unsure of carbs and it spikes my sugars, why I needed 4 slices bread so I have enough snacks plus xtra for lows, and cited the "Diet snack Sheet" AFSD Hay gave me in response to a Form 9 that detailed we are to get 2 slices bread and not bread rolls on snack sack. AFSD Hay replied on the Formal grievance, "We are following our diet specs to the letter with what we are given".

On 2/10/2021 Form 9 to 'Aramark-Julie Hay' complaining about how FSS Macdonald denied me bread in my snack Sack on my 2800 diabetic diet in which I got no response.

On Formal grievance to Unit Team A2 @ EDCF while I was in cell A2-211 RE the 2/10/21 incident in which FSS Macdonald denied me bread in my diabetic snack sack.

I explained what happened in detail, put me at risk for a low blood sugar, violated Aramark's "Diet Snack Sheet" and that despite me explaining all this FSS Macdonald still refused me bread. AFSD Hay replied, "Bread was not denied, it was to be served seperately, the bread was taken to the cell houses." This was a lie. Bread was never taken to the cell houses, never has been served seperatly prior or since, and I never got that bread on 2/15/21.

On Form 9 dated 3/12/21 to "Aramark - AFSD Hay," I complained, "I have been trying to get the carbohydrate and nutritional data, as well as a proper 2800 calorie diet menu, for the 2800 calorie diabetic diet. You told me to contact Topeka. I did. They gave me contact info for dietician. I wrote them over 2 months ago but no response. I read KDOC IMPP 10-106D. It says Aramark has the responsibility to submit the diet to the dietician for approval, meaning you have discretion over the menu. So, I am asking you contact your company's representatives who have the power to decide the menu and ask they submit to the KDOC contracted dietician the changes to the diabetic snack sack I am requesting and also get the dietician to give you the proper 2800 calorie menu you are obligated to have on site per your contract with KDOC. Currently, you have no approved 2800 menu from the KDOC dietician. (Please see attached for details)."

In response AFSD Hay said, "Please keep form 9's to a minimum. Details - I have no power or say over the dietician decision on your snack sack - State of Kansas provides the menus and snack sacks - This is the last Form 9 I will answer on this situation, I can't help you. - AFSD Hay"

On Form 9 dated 10/7/2020, AFSD Julie Hay is who I sent it to, I said, "May I please have a copy of the 2800 calorie diabetic

Menu? I know what the snack sack consists of but I want to have a copy of the actual main menu so I can plan ahead. I take insulin before meals so having the menu helps me better determine how much insulin to take and what items I can/can't eat so I can control blood sugars." AFSD Hay responded, "We don't have an actual diet sheet for you. Here is what I found on the computer to print off. We make your food from our daily menu. Hope this helps." What was attached was a five page document titled, "Diet Guide  Kansas DOC; Male; Fall Winter Created 9/18" which was September, 2018. It listed breakfast, lunch, and dinner items for each day. However, it was missing portion sizes, breads, fruits, milks, and only included grains/potatoes, protein, vegetables. It was utterly useless. On a Form 9 dated 2/11/21 I sent to AFSD Hay I said, "This morning at breakfast the kitchen forgot to send my 2800 calorie diabetic tray even though CD's had ordered it. I accepted a regular tray because I feared dropping low since it had been 30 mins since taking my regular insulin which goes into effect in 30 mins. I have gone into a coma 2x in the last 2 weeks so I didn't want to risk waiting for the correct tray. Can you make sure your supervisors are checking the meal carts before they leave the kitchen so this doesn't happen to me again. Thanks." I recieved a response on 2/15/21 stating "They are supposed to check them. However, mistakes do happen. Be sure to let them know right away." M. Bos, Classification administrator had responded possibly. Signed with a "M" That looks like her writing. So Unit Team sent to M. Bos instead of AFSD Hay with Aramark.

On 2/23/21 via Form 9 to Unit Team I said, "On 2/20/21

at breakfast meal pass I was given a regular meal tray that was labelled as 2800. I am type 1 diabetic and recieve the 2800. I said 2800's don't get cinnamon rolls on the tray. CO Cline said, "Well they do today and walked off continuing meal pass. CO Mounce didn't fix it either nor did → (cont. on attached 4 pages)... either one of them notify Aramark to bring me the correct tray. I rang into the bubble and asked for the CO's names so I could write a grievance but CO Shields refused saying, "That's not an emergency. They'll be around at tray pick up." He also refused to give me his name..." "At 3:42am CO Cline and CO Mounce refused to notify Aramark that my 2800 calorie tray was wrong and I needed a new one, that violates IMPP 10-106D because the 2800 is a medically prescribed modified diet. They also violated Title II of the Americans with Disabilities Act... They also violated my 8th amendment rights under the U.S. Constitution by engaging in cruel and unusual punishment by denying me the appropriate diet tray which can result in significant harm to me in the long term.... Aramark violated IMPP 10-106D because they gave me a 2800 calorie tray that had a cinnamon roll instead of the 3 slices of white bread I normally get. A cinnamon roll will spike my sugars considerably so I could not eat it which means I was shorted a significant portion of my meal tray after I had taken insulin..." "I took breakfast insulin at 3:04am that day, eating breakfast at 3:42am... The long term effects of high blood sugar are serious and severe. Aramark's repeated refusals to do things correctly over the last 1.5

years I have been here, including this specific incident, will have detrimental effects on my health. It is very difficult, if not impossible, for me to properly control my blood sugars if Aramark continues to be recklessly and deliberately indifferent to my nutritional needs as a diabetic. Please help me make sure Aramark is following the rules, and their contract, so that diabetics such as myself don't suffer serious health problems in the short and long term. Also please train these CO's to fix a bad meal tray when it's called to their attention. Thank you." On 2-25-2021 "M" responded, "I have talked with Aramark regarding this issue along with sent your similar issue grievance to them for response and to help rectify this situation. I have also redirected staff on this issue."

On 3/24/21 via Form 9 I sent to Unit Team I complained of my meal at lunch being delayed due to the AFSD Julie Hay not sending my tray down on time, when finally got corrected after way too much time passed it was wrong, and all of that put me at severe risk of a low blood sugar to the point I had to yell out the cell for a long time multiple times due to feeling my blood sugar dropping and needing my tray corrected. AFSD Hay was on duty that day at lunch and in charge of the kitchen. Nurse Ladwig gave me 8uR of Insulin instead of 12uR at my request because meals where delayed. This was at 10:30am, I had 2 slices of bread and an orange, both no protein. I had saved it from breakfast in case of meals/insulin being delayed because it happens so often. Still dangerous though w/o protein because that type of food metabolizes like

3 spoonfuls of sugar and won't keep my sugars up for more than 1.5 hrs from my experience of 25 years. At 11:15am CO Lathum and CO Cervantes came to my cell A1-142 @ EDCF and said "Aramark forgot your tray", which was a 2800 diabetic tray. They'd order it. At 11:45am I pressed the emergency call button and spoke w/ CO Tallman in the control bubble. He answered but only after 8 or 9 mins. I told him I am diabetic and asked if Aramark had brought my tray. He said no. I asked him to call Aramark to ask them to hurry since I had taken insulin @ 10:30am. He refused saying they aren't allowed to call on radio for things like that and Aramark doesn't have a phone on them. He said to wait for floor CO's to come around for tray pick up. I worked in the kitchen, the have a phone in the office, all have radios, CO's all the time call for them to fix trays 'etc. He lied. I told him my sugar was dropping this is an emergency but he still didn't do anything. CO Lathum gave me oranges and milk and said they'd get my tray. At 12:45pm SGT Austin (OIC) and SGT Simpson finally gave me my tray 2 hrs 15mins after insulin! I immediately hollered because AFSD they forgot my 2 slices of bread per my menu shorting me 30g carbs which is very dangerous since my carb to insulin ratio was around 5 or 6 to 1 meaning missing 30g carbs would drop my sugar out. SGT Austin came by but only "Aramark doesn't have bread". and refused to fix it. I told him they do and it's in a black storage top wrapped 2 slices each in seran wrap in

the area special diets / CRD's are made plus more in the freezer. He still said Aramark didn't have it. This is of course a lie because AFSD Hay herself has told me, "we always have bread," in a grievance response on 3/25/21 Form 9, AFSD Hay just refused to send it down even though it was apart of my prescribed medical diet. The CO's gave me extra milk and oranges thankfully otherwise I would have dropped low but I can't rely on them, as evidenced w/ my struggles I described above, so that risk of a low is real when AFSD Hay refuses to fix her mistakes.

On 3/29/21 on a Form 9 addressed to "Aramark - Mr. Weaver or Ms Hay" I said, "Again, I am having problems w/ my 2800 diet for what feels like the millionth time. Aramark supervisors clearly did not check the meal cart before it left the kitchen at dinner tonight and CO's did not verify the cart. I say this because they forgot my diet snack sack. That is all I have to keep my blood sugars up in between meals because I have no canteen. I have complained about this, and other issues w/ my diet, for over a year. Recently, in the last month and a half, I have had at least (5) seperate incidents where I didn't get a diet sack, didn't get the bread in my diet sack, didn't get a proper 2800 diet tray and instead got a regular tray labeled as a 2800, and I have grieved every single one. You have told me you'd fix it but it is still happening. Please tell me specifically what you are willing to do to fix this problem please. At this point I think I deserve that, especially since I went to the hole over one of these incidents last month.

Btw, I got my diet sack 30mins after my tray but this should not happen and is extremely stressful on me." AFSD Hay responded, "We have verified that all items are on the cart. If the CO's are giving the wrong stuff to the wrong person we can't fix that."

On 3/25/21 Form 9 (seperate) addressed to "Aramark - Mr. Weaver or Ms. Hay" I said, "CO Austin in A4 forgot to order my 2800 tray for lunch on 3/24/21. When it was finally brought to me at 12:45pm it was missing the bread. I immediately (talked) to CO Latham, It never got fixed. Austin said you said you didn't have bread. I told him you have bread in special diets in a black tub. The bread is wrapped in seran wrap plus there is bread in the freezer. He still claims you said you didn't have it. I don't believe that at all. I am tired of having my diet messed with. Why are Aramark supervisors not verifying trays leaving that kitchen for seg? FSS Pinkerton (Seg supervisor) should not have allowed that to happen. I want him held accountable and for the constant mistakes to stop. Twice in one day is ridiculous." AFSD Hay replied, "We always have bread, Let me talk to him."

On Form 9 dated 3/25/21 (different one) addressed to "Aramark Mr. Weaver or Ms Hay" I said, "I was given a 2800 tray (styro) for dinner on 3/24/21. It was labeled 2800 but it was a regular tray as far as the food inside. (1) cake, (1) Roll, homestyle Scalloped potatoes, (1) portion diced carrots. Aramark also forgot my 2800 snack sack. CO Patterson had to call for it to be delivered. The 2800 tray should have been plain scalloped potatoes, meat seperate from potatoes, (2) portions diced

carrots, no cake, and bread. This type of stuff is happening way too often. This is my 4th or 5th issue in a month, You guys keep saying it will get fixed but it doesn't. Something needs to change in that kitchen to ensure accuracy and consistency. I don't expect perfection but this is happening way too often. If supervisors and CO's are both supposed to be verifying carts how can this still be happening? AFSD Hay replied, "Not sure, you are the only one complaining about the 2800 tray."

On 4/3/21 I sent a Formal grievance to Unit Team Supervisor Buchanan. I said, "I have informally grieved issues with my 2800 meal tray 10 different times from 2/3/21 to 3/27/21. Today is now the 11th time Aramark and/or CO's have messed up my meal tray recently. I am beyond sick of this! Today On 4/3/21 I recieved Frosted Flakes when per Ms. Hay, AFSD, I am to recieve <u>unsweetened dry cereal</u>. Per IMPP 10-106 D and per Centurion's Provider, this violates my medical modified Dash Diet (2800). This is discrimination for me having diabetes and retaliation for complaining about issues related to my diabetic care. Violates Title II of the ADA. UTS Buchanan forwarded to AFSD Hay. She replied, "Your attachment is not a diet sheet we use — not sure where you got this." I had attached Form 9's dated 10/7/20, the Diet Guide she gave me when she replied to the Form 9 On 10/7/20 AFSD now is saying she knows nothing about, and attached 3 Form 9's dated 3/25/21, form 9 dated 3/24/21 Form 9 2/23/21 w/ 4 pages written attached, 2/11/21 Form 9 too all detailing diet issues that were her Fault and Other FSS's Fault too.

(1) Count 4 : Defendant UNK Escorts, approximately a member of KDOC (EAI) violated my 8th amendment rights of the U.S. Constitution.

(2) Supporting Facts:

On Form 9 dated 3/2/21 to "EAI" I asked, "Please preserve video in all cell houses, especially A2 where I was on 2/10/21. Please preserve the video from 5pm to 10pm on 2/10/21 for the front doors and for my cell that night which was A2-267. Aramark is claiming bread was sent to the cell houses for 2800 diet snack sacks. They are lying. I was denied my bread that night in violation of IMPP 10-106D, Americans with Disabilities Act Title II, and my 8th amendment rights under the U.S. Constitution protecting me from cruel and unusual punishment. I am Type 1 diabetic and was denied the bread in my snack sack violating my diet. I have a grievance being sent to the Warden and need this evidence preserved please. UNK EAI defendant said, "The video for that cell house is not available". He/she signed it but illegible and they did write "EAI" next to their signature and stamped the Form 9 "Recieved 3/3/2021 EDCF EAI".

On 3/17/21 afternoon I recieved the 3/2/21 Form 9 response and immediately filed a formal grievance due to the fact UNK EAI defendant refused to preserve the video. I had attached the Form 9 on 3/2/21 and it was forwarded by Unit Team to Classification Administrator M. Bos who responded 3/31/2021. She had recieved 3/30/21 per her writing on the grievance.

DO NOT WRITE BELOW THIS LINE

(1) Count 9 : Defendant Marsha Bos Classification Administrator @ EDCF violated my 8th amendment rights under the 8th amendment rights under the U.S. Constitution.

(2) Supporting Facts :

On 3/31/21 "M. Bos Classification Administrator" on KDOC EDCF letterhead sent me a grievance response to my formal grievance and Form 9 attached dated 3/2/21 detailing my request for EAI to preserve video on 2/10/21 for evidence Aramark I red about giving me bread in my snack sack, putting me at severe risk of low blood sugar, and EAI saying it wasn't available. She said, "Findings of the facts: Your grievance was forwarded to me regarding your request to preserve the video from A cellhouse. Conclusions made: You also claim you are being discriminated against because of your diabetes by not getting bread in your snack sack. I reviewed the reports and found that staff addressed your complaint during meal line, but you were not satisfied with their answer and made threatening and disrespectful statements during that interaction. I checked with medical and food service @ you are a 2800 calorie diet. At supper time, you are to recieve a snack sack that would contain peanut butter, bread, and some type of fruit. I cannot prove that they were discriminating against you due to your diabetes since there was not any bread in your snack sack. It may have been an oversight or mistake by food service, because you state they were to send some down to the Unit. I have spoken with the Food Service Supervisor about this incident to make sure it does not happen again. You requested that the video footage from 2/10/2 in A cellhouse be preserved by EAI to support your claim in your grievances that bread was not brought down to A cellhaus that night for the snack sacks. EAI responded to you that the video was not available for that date and you do not believe that the video is not available. I checked

into this and the video is not available ...".

Action taken: Nothing further ". She purposefully misstated what I said on my 3/2/21 Form 9 as I stated on
                    . Aramark claimed they sent the bread down on a
Form 9 response                 not me. I stated clearly they lied.
I also stated this in a 2 page handwritten letter attached to the formal grievance that was forwarded to M. Bos by Unit Team along w/ all pertinent details along with my Original Form 9 dated 3/2/21. I had also mentioned my parallel grievance on Ms. Macdonald, the FSS who denied me the bread, in my attached 2 page letter which M. Bos made reference to in her response and clearly saw.

She makes light of the fact "It may have been an oversight or mistake by food service "when I clearly stated on my attached paperwork not having any bread was a threat to my health and went into more detail on the parallel grievance on Ms Macdonald she clearly saw too.

She knows these incidents have been occurring frequently long before and since the 2/10/21 incident w/o anyone being held accountable and w/o any discernable improvement in performance by Aramark's FSS's causing me serious harm I described in numerous grievances in explicit detail.

On her response she claimed the video for a 5 hour period of time that I had requested (5pm-10pm on 2/10/21) was not available in a Max security prison that had just had riots in 2018 not to mention has so many security incidents on a regular basis at this time that EAI is constantly responding to calls involving uses of force every day on all shifts in which people are getting injured.

DO NOT WRITE BELOW THIS LINE

This is not likely to be true under those pervasive conditions. She didn't do anything to ensure the diet issues + my truck back were fixed by her own admission when she said, "Action Taken: Nothing Further". All she did was talk to the FSS, which was ineffective considering the issues continued w/o any improvement whatsoever. She didn't even speak with the CO's in A1 who worked that night to see it truck was brought down, which they would have been able to verify my account that it wasn't brought down. She whitewashed the whole thing and swept it under the rug.

(1) Count 10 : Defendant FSD J. Weaver violated my 8th amendment rights of the U.S. Constitution.

(2) Supporting Facts :

On Form 9 dated 12/8/20 to "Aramark, Kitchen Attn: Weaver" I complained of diet issues doing me harm. I detailed this on Count _____ for Defendant AFSD Hay, whom Weaver, the Food Service Director, delegated to in order to respond to me.

On 7/18/21 Form 9 to "Unit Team" (UTS Brian Reeves) I complained of rotten turkey in my diet sack. I asked, "I want FSD Weaver held accountable for that". UTS Reeves responded, "The issue is being worked on at this time". That presumably means FSD Weaver was made aware. I detail this on Count _____ for Defendant UTS Brian Reeves.

(1) Count 11 ~ Defendant Cristina Correctional Services contracted dietician violated my 8th amendment rights of the U.S. Constitution.

(2) Supporting facts:

(1) Count 12 : Defendant Food Service Supervisor (FSS) Ms. Macdonald with Aramark violated my 8th amendment rights of the U.S. Constitution.

(2) Supporting Facts:

Via Form 9 dated 2/10/2021 I complained that FSS Macdonald knowingly and deliberately denied me my bread on the snack sack for my 2800 prescribed medical diabetic diet at dinner when I passed through meal line at dinner on 2/10/2021. The Aramark diabetic "Diet Snack Sheet", as it is titled per the ACS Medical Nutrition Therapy Manual page .27, has 2 slices of bread, 2oz meat or peanut butter, and a piece of whole fruit. My diet sack Ms. Macdonald handed me was short bread. I politely explained to her I needed my bread. She said, "diabetics don't get bread". I said, "Yes we do it is on the diet snack sheet you should have posted". She said, "No, move along" and shooed me away with her hand. I complained then to CO Neeley and Lt Johnson but they refused to help. I went to eat my dinner. I got into an argument w/ Lt Johnson when leaving the dining hall because he wrote me up for arguing. He eventually sent CO's to take me to medical for a pre Seg clearance prior to putting me in disciplinary segregation A2 @ EDCF. I complained to Nurse Son when I got a b.S. check. My sugar was 165 mg/dl right after dinner. I asked him if I was right that denying me that bread puts me at risk for a low. He said, "Yes, especially with your b.S. being 165 it could drop you out." CO Freeman and CO Neeley witnessed this. I told Ms. Macdonald this too when I was in line that my sugar could drop w/o my full snack sack but she didn't listen, nobody gave me that bread.

DO NOT WRITE BELOW THIS LINE

The only reason I didn't drop out so low was on
I got 2 hot dog buns from another prisoner at dinner who
thankfully shared his xtra with me. Depriving me of that
bread, when I had no additional food in my possession
created a serious threat to my health and safety
because I would go into a diabetic coma if I had
not been lucky to get 2 hot dog buns from that fellow
prisoner. At no point did anyone help me get that
missing bread including Ms. Macdonald.

Ms Macdonald is a seasoned, well trained FSS that knew
what the diabetic snack sack consisted of and still
chose to deny me that bread.

On 3/12/21 I got out of the hole for the issues on 2/10/21
That same day I started work back in the kitchen and FSS
Macdonald was working on main line again. Workers eat their
dinner in the kitchen while working. It was time for me to eat
per my medical routines so I asked FSS Macdonald for my
snack sack. She gave it to me but it didn't have any
bread in it nor did the other diabetic sacks. I politely
reminded her I needed bread per the diet snack sheet.
She then helped me get the bread w/o argument. Likely,
the reason is because she was told we do get bread but
still was about to hand out sacks w/o the bread putti
every diabetic in the facility @ risk for a low... again.
On a Form 9 dated 4/16/21 to UTS Horsch I

DO NOT WRITE BELOW THIS LINE

complained about a prisoner kitchen worker refusing to give me correct 2800 tray and instead tried to give me a Regular tray with a milk and orange at lunch when FSS Macdonald was w/ him at the window and refused to correct him and ensure I get a proper tray. I detailed this, which was forwarded to Aramark AFSD Hay by UTS Morsch, on Count _____ for Defendant AFSD Hay

(1) Count 13 ": Defendant Unknown Food Service Supervisor (FSS) violated my 8th Amendment rights of the U.S. Constitution.

(2) Supporting Facts:

On a Form 9 dated 8/26/21 sent to "Unit Team" I complained, "A few days ago I sent in a Form 9 about these same issues. I have not recieved any response and these issues are still ongoing. Since the last Form 9 I have had 5 of my meals messed up and my snack sack. 8/25/21 at breakfast I got bun instead of 3 slices of bread that menu says I am to get. I was shorted at least 9 carbs. 8/25/21 at lunch and dinner I didn't get sliced bread. On 8/26/21 Breakfast didn't get sliced bread. On 8/26/21 at lunch they gave me a regular tray instead of a 2800 and just labeled it 2800. At 8/26/21 dinner they forgot my snack sack so CO Rose had to cobble together a sack for me. They didn't give me sliced bread at dinner. As I have explained many times this messes up my blood sugars when they do this! I want someone to enforce the contract and make Aramark follow its own menu. Please respond Asap." UTS Brian Reeves Responded, "The issue has been recognized and is being addressed at a higher level than mine." Also, there was another instance on 9/11/21 I complained of on same grievance at the Formal stage to UTS Reeves on 9/11/21 in which I said, "Aramark forgot my 2800 breakfast tray per CSI Gadberry..." Since CSI Gadberry refused to fix it I had to accept a Regular tray which included Coffee cake, which could spike sugars. All because Aramark didn't send my tray at all.

Form 9 dated 6/28/21 to "Unit Team" sent to Aramark by UTS Brian Reeves I detailed multiple issues w/ my meal trays and diet snack sacks over several days. I don't know which FSS is to blame but it was whoever was on seg line for those times. This is detailed on Count _____ for Defendant AFSD Julie Hay.

Form 9 dated 7/1/21 to "Unit Team" (UTS Brian Reeves) I complained of being shorted 1 slice of bread on my 2800 tray at lunch on 7/1/21. I detailed this on Count _____ for Defendant UTS Brian Reeves.

Form 9 dated 7/11/21 to "Unit Team" (UTS Brian Reeves) I complained of several diet issues. I detailed these on Count _____ for Defendant UTS Brian Reeves. Multiple incidents on multiple days due to FSS for seg line not ensuring my diet was followed. Caused blood sugar to spike to 410 mg/dl at lunch on 7/11/21.

Form 9 dated 10/27/20 to "Aramark - Julie Hay" I complained of meal issues on 10/26/20 @ breakfast, and various inconsistent delivery of meals causing blood sugar problems, which is the fault of FSS Seg line Supervisor. Detailed on Count _____ for AFSD Hay.

Form 9 dated 12/8/20 to "Aramark Kitchen Attn: Weaver" I complained of not getting diet snack. Fault of FSS Seg Supervisor at dinner on 12/8/20. Detailed on Count _____ for AFSD Hay.

Form 9 dated 1/15/21 to "Aramark Julie Hay" I

complained of issues w/ diet sacks at dinner, issues w/ meals in general on and before 1/15/21. This is the fault of FSS Seg line Supervisor. I detail on Count _____ for Defendant AFSD Hay.

Form 9 dated 2/3/21 to "Aramark Ms. Hay" I complained bread rolls missing from snack sacks multiple times prior 2 weeks, This is the FSS Seg line Supervisor's fault. I detailed this on Count _____ for Defendant AFSD Hay.

Form 9 dated 7/18/2021 to "Unit Team" (UTS Brian Reeves I complained of spoilt turkey in our diet Sacks, including mine, at dinner on 7/18/22. This is the fault of the FSS Seg line Supervisor. I detailed this on Count _____ for Defendant UTS Brian Reeves.